BETTER BUSINESS BUREAU OF DETROIT, INC., *v.*
FIRST NATIONAL BANK—DETROIT.

1. Subscriptions—Contracts—Consideration.

The consideration for a subscription contract with a corporation organized and operated for the purpose of promoting and maintaining fair competition and dependability in the advertising of merchandise in all kinds of business was the subscriptions of all the other subscribers.

2. BANKS AND BANKING—SUBSCRIPTION CONTRACT—ULTRA VIRES.

So far as a national bank is concerned, its subscription contract with a corporation organized and operated for the purpose of promoting and maintaining fair competition and dependability in the advertising or merchandise in all kinds of business would not be *ultra vires*.

3. APPEAL AND ERROR—FILING OF CLAIM OF APPEAL—REHEARING BY TRIAL COURT.

A trial court may grant a rehearing after the filing of a claim of appeal.

4. SAME—SUPREME COURT—AMENDMENT OF RECORD—ADDITIONAL EVIDENCE.

The Supreme Court may, at any time in its discretion, permit the transcript or record to be amended by correcting errors or adding matters which should have been included or continue the cause until such further evidence shall be taken and brought before it as the court may deem necessary in order to do justice (Court Rule No. 72 [1933]).

5. DAMAGES—BREACH OF SUBSCRIPTION CONTRACT—RENT TO AN AFFILIATE.

The extent of defendant bank's liability for breach of its subscription contract with plaintiff was the amount plaintiff had had to pay as rent where defendant's obligation under the subscription was conditioned upon the payment of a like sum as rent to a corporate affiliate of defendant who was plaintiff's landlord.

6. COMPROMISE AND SETTLEMENT—LANDLORD AND TENANT—ACCEPTANCE OF BELATED PAYMENTS.

Upon acceptance by landlord of tenant's payments under landlord's compromise offer as to rent, the account became settled notwithstanding a portion of the money was not received until 11 days after the time to which the offer had been extended.

7. COSTS—SUBSTANTIAL REDUCTION OF JUDGMENT.

Costs are awarded appellant where, upon appeal from judgment in case heard without a jury, it secured a reduction in the judgment from $3,295.62 to $700 and accrued interest.

Appeal from Wayne; Miller (Guy A.), J. Submitted October 23, 1940. (Docket No. 96, Calendar No. 41,330.) Decided March 11, 1941.

Assumpsit by Better Business Bureau of Detroit, Inc., against First National Bank—Detroit on a subscription contract. From judgment for plaintiff, defendant appeals. Modified as to damages, and affirmed.

*Sempliner, Dewey, Stanton & Honigman* (*Thomas L. Poindexter,* of counsel), for plaintiff.

*Robert S. Marx, Carl Runge,* and *Thomas L. Conlan,* for defendant.

NORTH, J. Plaintiff, Better Business Bureau of Detroit, Inc., organized and operated for the purpose of promoting and maintaining fair competition and dependability in the advertising of merchandise in all kinds of business, brought suit against defendant First National Bank—Detroit, a banking corporation, on a subscription of $2,660, made by defendant on January 30, 1933. Plaintiff's opening statement contains the following:

"This case was sought to be removed to the United States court by the defendant, and while the question was being determined as to the right of the defendant to remove this case and others like it, to the Federal court, the matter lay fallow for two years. Before the removal, the plaintiff had defaulted the defendant for failure to plead or answer or appear in this case. When it was determined in the circuit court of appeals that this case is not a removable case, then the defendant sought to reenter the case in this court and have the default set aside, and your Honor will find a stipulation setting aside the default on certain conditions, one of which is the case should be tried without the jury, and another is that interest is allowable on these liquidating dividends or payments on account of claims from the dates when the several payments were made to

the time when—I suppose, to the time that the verdict or judgment—I think the stipulation says to the time the money is received by the plaintiff in the event of a verdict or judgment for the plaintiff."

Defendant became a subscribing member of the Bureau in 1924, continuing as such until 1930, when it and other banks became a part of the newly organized Detroit Bankers Company. In 1931 and 1932 a group subscription was made to the Better Business Bureau by the Detroit Bankers Company. The amounts paid by the various Detroit banks in support of the activities of the Bureau were based upon a rate of $5 for each million of their resources. In the Detroit Bankers group was also plaintiff's landlord, First National Bank Building Company.

Conversations between Mr. McEldowney and Mr. Kempton of the Bureau, and Mr. Moninger, manager of the First National Bank Building Company, resulted in an offer by Moninger to procure a subscription for the year 1933 from the holding company (Detroit Bankers Company), it being understood that payments on the subscription would be used by the Bureau for the purpose of paying its rentals to the First National Bank Building Company. Moninger talked with Mr. Joseph Dodge about the matter and, at a meeting of the governing committee of the board of directors of the First National Bank—Detroit, held January 30, 1933, where Dodge acted as secretary, the following entry was made upon the minutes:

"Better Business Bureau

"As requested at the previous meeting, a report and recommendation was submitted by A. V. Moninger of the First National Bank Building Company, on the lease situation with respect to the Better Business Bureau.

"The recommendation that the subscription be $2,660, provided it was returned to the Building Company in the form of rent, was approved."

Defendant bank closed at the time of the banking holiday in 1933, and never reopened. The subscription was not paid and plaintiff paid to the building company on account of rent for that year the sum of $700, the balance on its unpaid rental claim having been adjusted and settled between plaintiff and the building company. Neither Detroit Bankers Company nor First National Bank Building Company is a party to the instant action.

Defendant denied the indebtedness and the claimed contract based on the quoted resolution, and alleged that, if such contract did exist, it was *ultra vires*.

Testimony was taken by the trial court, sitting without a jury, and a judgment was entered for plaintiff in the sum of $3,295.62.

The law in this State with respect to subscription may be found in *Comstock* v. *Howd*, 15 Mich. 237, 243, where the court said:

"The subscription itself, together with the appointment of plaintiff to raise the money by subscription, to make all necessary disbursements, and his acceptance of the position constituted a valid contract between the defendant and the plaintiff."

In that case the declaration did not allege any disbursement or the incurring of liability by plaintiff. The court held the declaration to be good and experienced no difficulty with the question of consideration. In the matter now before the court defendant claims that the disbursement of the subscription money was not made by plaintiff to the building company in the form of rental. Plaintiff

answers this argument by pointing out that it could not be so paid because it was never received.

The *Comstock Case* has been followed in subsequent opinions of this Court, which are authority for the trial judge's conclusion that:

"I do not think we need to spend any time on the proposition there was not any valid contract because the testimony establishes here the objects for which the Better Business Bureau was organized. It establishes there was a number of subscriptions and the subscription of each subscriber would have as a consideration the subscriptions of all the other subscribers. So I think the testimony establishes a valid consideration for the subscription. I think the testimony establishes a contract."

On the question of *ultra vires* we agree with the view of the trial court, expressed as follows:

"I do think, however, that the making of this kind of an agreement is absolutely within the fair scope of the powers of a bank, whether a national bank or any other kind of a bank. It certainly is within the power of the bank to hire watchmen to guard its vaults, it certainly is within the power of the bank to hire attorneys to examine abstracts, or examine into the validity of contracts, it certainly is within the power of the banks to subscribe to commercial agencies and get all the reports they can get, and I think it is most certainly within the power of the bank to become a party to an activity which is carried on for the purpose of discovering concerns that are engaged in unsound business practices and endeavoring to produce sound and helpful methods of carrying on business. Outside of taking money in over the counter, and lending money, and collecting it, I cannot think of anything that is more directly within the scope of things that are useful and necessary to the carrying on of the banking

business than this. The bank has to be prudent, it has to be watchful, it has to know what is going on, and in order to do that, it can avail itself of any kind of machinery that is reasonably appropriate for that purpose. I do not think that the making of such a contract as this can possibly be held to be *ultra vires*."

Before defendant had filed its claim of appeal, plaintiff presented a motion in which it sought leave to supplement the record by additional testimony. Defendant objected to the granting of this motion on the ground that, upon filing the claim of appeal, the trial court had lost jurisdiction, citing *Daugherty v. Reading,* 266 Mich. 514. The trial judge indicated that there might be some doubt about his right to take additional testimony and suggested that defendant make its objections a matter of record. Defendant's counsel declined, relied upon his special appearance on the motion, and refrained from further participation in the hearing. The additional testimony received by the court had to do with the nature of the services rendered by the Better Business Bureau to various banking institutions who were its subscribers, including the defendant.

This procedure is unobjectionable. A trial court may grant a rehearing after the filing of a claim of appeal. *Hughes v. Wayne Circuit Judge,* 239 Mich. 110, and the Supreme Court may at any time in its discretion "(d) Permit the transcript or record to be amended by correcting errors or adding matters which should have been included; (e) Continue the cause until such further evidence shall be taken and brought before it as the Court may deem necessary in order to do justice" Court Rule No. 72 (1933).

The remaining issue meriting consideration on this appeal is appellant's claim that the judgment

entered was excessive. One of appellant's questions presented on this appeal is as follows:

"Where breach of an executory contract is had prior to complete performance of the same, may either party recover on the theory of complete performance?"

In its brief appellant asserts:

"The only possible element of damage pleaded or proven by plaintiff was payment of $700 in rent. * * * However, this sum was the only sum ever mentioned in any pleading or any proof that plaintiff may have expended as a result of defendant's so-called subscription contract. Defendant submits, therefore, that any recovery in this case cannot exceed the sum of $700."

This case should be decided on the theory that, as disclosed by the record, there was a contract on the part of defendant to contribute through its subscription $2,660 for the year 1933; *but that this obligation was conditioned* upon plaintiff paying that amount to the National Bank Building Company in satisfaction of plaintiff's rent.

Under such circumstances, if the contract had been carried out literally plaintiff would not have realized anything over and above the payment of its rent. The record shows plaintiff did not pay its rent except to the extent of $700. And the record also shows that plaintiff's landlord made a proposition to settle the rent in full for $700. This proposition was made November 2, 1933, but by later communication the time limit of this offer was extended to December 11th. From June 5, 1933, to December 9, 1933, plaintiff paid its landlord at the rate of $50 per month. But on December 22d two payments were made aggregating $350, and these payments made a total of $700, the amount named in the landlord's offer. While these payments on December

22d were made 11 days after expiration of the time limit in the offer, still they were accepted by the landlord. Under the circumstances it is a fair inference from this record that the acceptance of the slightly belated payments constituted performance of the offer and the rental account was thereby settled. This conclusion is further justified by the fact that it does not appear from this record that subsequent to 1933 any further attempt was made to collect rentals from plaintiff up to the time this suit was tried in May, 1940.

Since plaintiff's rental account was settled by the payment of $700, that is the full extent of the damage plaintiff suffered by reason of defendant's breach of its subscription contract. This is true because, had defendant fully performed its contract by payment of $2,660, plaintiff was obligated to pay the money it so received to its landlord in satisfaction of its rent. Under the terms of defendant's subscription plaintiff could not realize any money over and above its rent. It is clear that the parties to the subscription contract never contemplated that plaintiff should benefit from the subscription except as it was used to pay plaintiff's rent. Defendant's relation to plaintiff's landlord was such that defendant had a direct interest in providing that its subscription of $2,660 should be used in paying plaintiff's rent. The express condition of defendant's obligation was "that the subscription be $2,660, *provided* it was returned to the building company in the form of rent;" but plaintiff paid only $700 on its rent and was released from further payment. Therefore recovery in this case, heard by the court without a jury, should be limited to $700 and accrued interest.

Consideration has been given to other questions presented by appellant's brief, but except as hereinbefore noted, they are without merit. The case is

remanded to the trial court that the judgment heretofore entered may be vacated and one entered in accordance herewith. Cost of this appeal to appellant.

SHARPE, C. J., and BOYLES, CHANDLER, MCALLISTER, WIEST, and BUTZEL, JJ., concurred. BUSHNELL, J., did not sit.