## BUELL *v.* ORION STATE BANK.

1. BANKS AND BANKING—IMPAIRMENT OF CAPITAL—PRESIDENT—
MENTAL COMPETENCY.

> Mental incompetency of plaintiff's late husband to make as-
> signments of mortgages and otherwise procure $20,000 with
> which to replenish the impaired capital of defendant bank of
> which the husband had been the president and director and
> of which he and plaintiff were the owners of a majority of
> the stock *held,* not to have been shown by a preponderance
> of the evidence, especially in view of the fact they had
> obtained advice of counsel, were protected as far as possible
> against any personal liability resulting from husband's par-
> ticipation in impairment of the bank's capital while its
> official and plaintiff's mental competency to participate in
> the transaction is not questioned.

2. SAME—IMPAIRMENT OF CAPITAL—STOCK ASSESSMENT.

> Bank stockholders may be required to meet the deficiency in
> the capital which has become impaired by payment of an
> assessment pro rata on the amount of capital stock held by
> them and the directors are required by statute to levy such
> assessment (CL 1948, § 487.55).

3. SAME—OFFICERS—DIRECTORS—PERSONAL LIABILITY FOR VIOLATION
OF FINANCIAL INSTITUTIONS ACT.

> Any officer or director of a bank who knowingly violates or
> permits any agent, officer or director of a bank to violate
> any provision of the financial institutions act or any valid
> rule or regulation of the State banking commissioner is per-

REFERENCES FOR POINTS IN HEADNOTES

[1] 24 Am Jur, Gifts, § 16.
[2] 7 Am Jur, Banks, §§ 44, 45.
[3] 7 Am Jur, Banks, § 298.
[6] 40 Am Jur, Payment, § 214.
[7–9] 24 Am Jur, Gifts, § 2.
[8] 24 Am Jur, Gifts, § 20 *et seq.*
[10–11] 46 Am Jur, Restitution and Unjust Enrichment.

sonally and individually liable for all damages sustained by any shareholder or any other person in consequence thereof (CL 1948, § 487.76).

4. SAME—IMPAIRMENT OF CAPITAL—RETURN OF CONTRIBUTION—EQUITY.

Return of sum contributed to bank by plaintiff and her late husband after its capital had become impaired while he was its president and director *held*, not compellable in equity in view of his position of trust and failure to show that return of such money would not again result in an impairment of the bank's capital.

5. SAME—REPLENISHMENT OF CAPITAL—FRAUD—OVERREACHING—EVIDENCE.

Fraud or overreaching by bank or its directors as to plaintiff's late husband who had been its president and director when capital became impaired, *held*, not to have been shown incident to transaction whereby plaintiff, her late husband and others, with full knowledge of the facts, replenished the impairment.

6. SAME—CONTRIBUTIONS TO REPLENISH IMPAIRED CAPITAL—CONSIDERATION.

Mutual contributions by other stockholders to replenish impairment of capital constitute consideration for one stockholder's contribution for such purpose, hence contribution for such purpose may not be recovered because of failure of consideration.

7. SAME—IMPAIRMENT OF CAPITAL—CONTRIBUTIONS—CONSIDERATION—GIFTS.

No consideration is necessary to validity of contribution by a bank stockholder to replenish impairment of bank's capital if such contribution be considered a gift to the bank.

8. GIFTS—PASSAGE OF TITLE—DELIVERY—ACCEPTANCE—PRESUMPTIONS.

To constitute a valid gift the donor must possess the intent to pass title gratuitously to the donee, there must be an actual or constructive delivery and the donee must accept it, although if the gift be beneficial to the donee, an acceptance will be presumed.

9. SAME—CONSIDERATION—TRANSFER OF TITLE.

Lack of consideration does not invalidate a gift nor deprive it of its character as a transfer of title.

10. MONEY RECEIVED—UNJUST ENRICHMENT.

Unjust enrichment does not result from retention of benefits involuntarily acquired which law and equity give the recipient absolutely without any legal or equitable obligation on his part to make restitution.

11. BANKS AND BANKING—IMPAIRMENT OF CAPITAL—CONTRIBUTIONS BY STOCKHOLDERS—UNJUST ENRICHMENT.

Defendant bank was not unjustly enriched by receipt of contributions from stockholders when the bank's capital became impaired.

Appeal from Oakland; Davis (Morris K.), J., presiding. Submitted January 5, 1950. (Docket No. 61, Calendar No. 44,115.) Decided February 28, 1950.

Bill by Yvonne B. Buell, individually and as administratrix of the estate of Clarence R. Buell, deceased, against Orion State Bank to set aside assignments of mortgages. Decree for defendant. Plaintiff appeals. Affirmed.

*Estes & Cooney,* for plaintiff.

*Harry J. Merritt,* for defendant.

BOYLES, C. J.  Plaintiff, individually and as administratrix of the estate of her deceased husband, Clarence R. Buell, filed this bill of complaint to cancel certain assignments of mortgages to the defendant bank and to compel the bank to return the balance of approximately $20,000 which plaintiff claims was obtained from Dr. Buell while he was mentally incompetent. The circuit judge, after a hearing, dismissed the bill of complaint and plaintiff appeals.

The controversy arises mainly over disputed questions of fact. Plaintiff claims (1) that Dr. Buell was mentally incompetent when he contributed $20,-000 to the capital structure of the defendant bank,

(2) that there was a gross inadequacy or lack of consideration, (3) that the bank was guilty of fraud and "overreaching," and (4) that the bank should be held liable "upon the theory of unjust enrichment, or loan."

In 1940, the plaintiff and her husband Dr. Clarence R. Buell owned a majority of the shares of the common capital stock of the defendant bank, 160 shares of which were held by them jointly and 10 shares of which stood in the name of Dr. Buell. In 1940 and until sometime in January, 1941, Dr. Buell was the president and a director of the bank. During that time the capital of the bank became impaired due to the making of bad loans on some commercial paper. Dr. Buell had been one of the incorporators of the Service Mortgage Company, a Michigan corporation. Jack Kennedy, also one of its incorporators, was an employee of the bank during the incumbency of Dr. Buell and acted for the bank in the acceptance of loans. Upon his recommendation the bank accepted certain commercial paper offered by the Service Mortgage Company, for which that company received a commission for obtaining the loans from the bank. In 1940, these loans, between $60,000 and $80,000, began to "sour." The local postmaster, who was also a director of the bank, testified at the hearing in the circuit court as follows:

"*Q.* And what called your attention to the fact the bank was going wrong?

"*A.* Dr. Buell. He came over to the post office one day to see me, I think in November, 1940, and he says you know he says, 'There's lots of bad paper got in this bank, it's going to be bad for us,' and he seemed to worry much more about it than I did. I said, 'Oh, maybe it will come out all right.' He said, 'No, it don't look good.' He also says 'I am sick of the banking business. I'm going to get out of here.' "

During the first week in January, 1941, Dr. Buell tried to get other bankers interested in taking his stock. Among them was one Oran C. Thomas who had been opening a new bank in Deckerville in December, 1940. Dr. Buell solicited Mr. Thomas to take over his stock in the defendant bank. This culminated on January 10, 1941, and the 170* shares of stock of the plaintiff and Dr. Buell were transferred to Mr. Thomas on a written agreement prepared by an attorney and executed by Dr. Buell and his wife, as follows:

### "AGREEMENT

"Whereas this date Clarence R. Buell and Yvonne B. Buell have, for One Dollar, sold unto Oran Thomas 170 shares of the capital stock in the Orion State Bank and which shares constitute more than the majority of outstanding common stock and by the execution of this instrument, the said Oran Thomas acknowledges said sale and the receipt of the stock certificates, properly indorsed,

"Now, therefore, as a part of the consideration for the sale and purchase of said stock, it is hereby agreed as follows:

"1. Oran Thomas does hereby agree to hold Clarence R. Buell and Yvonne B. Buell harmless from any and all liability to which they might be subjected by reason of having owned said stock.

"2. It is made known that Clarence R. Buell will be the owner of 5 shares, out of the 170 shares, of common stock, which 5 shares are hereby guaranteed to be delivered to Clarence R. Buell forthwith by Oran Thomas, who does agree to advance any sums of money which might be demanded because of depreciation in the capital assets of the bank applicable to said 5 shares and that such advancements will be made without any liability on the part of Clarence R. Buell to repay the same to Oran Thomas.

---

* 5 shares were transferred back to Dr. Buell.

"3. Oran Thomas agrees to hold Clarence R. Buell harmless from any and all claims and liabilities to which Buell might otherwise be subjected by reason of any liability which would arise out of the fact that Buell had been a director of said bank.

"4. Thomas agrees not to attempt to cancel except upon official instructions from the Michigan State banking department or The Federal Deposit Insurance Corporation, nor influence the cancellation of a certain contract now in existence between the Orion State Bank and the Service Mortgage Company, a Michigan corporation.

"In witness whereof the parties hereto have set their hands and seals this 10th day of January, A.D. 1941, for the intents and purposes herein contained.

"CLARENCE R. BUELL
"YVONNE B. BUELL
"ORAN THOMAS

"In presence of
"HAROLD E. HOWLETT
"M. JEAN COVENTRY"

The Service Mortgage Company referred to in the above contract was the corporation organized by Dr. Buell, and the source of the loans which caused the impairment of the capital stock of the bank. Plaintiff herself was familiar with the circumstances of this transaction. She had discussed with the Doctor the situation and about getting rid of the stock. She testified:

"We sort of worked our problems out together. I felt it was advisable to get rid of the stock, too. * * * I don't know as we discussed the value of the stock.

"Q. Wasn't Mr. Howlett (their attorney) with you at the time?

"A. We went in and talked with Mr. Girard at the bank.

"Q. At that time, in that discussion, as a matter of fact, the doctor brought over an adding machine

tape showing totals of bad loans, some $60,000. He made the statement there the stock was worthless?

"A. Yes. In his mind I think possibly it was, because he couldn't see any way out.

"Q. Then the subsequent investigation by the F.D.I.C. and the State banking department bore out his conclusion that the stock was worthless at that time, didn't it?

"A. They asked for additional moneys.

"Q. That is right. In other words, the stock you folks owned at that time had become worthless through these bad loans in the bank, hadn't it?

"A. I didn't answer that question. I said the F.D.I.C. required more money put into it, but I wouldn't say whether the stock was worthless or not. The doctor had reached that conclusion at the time of that conference in Mr. Girard's office (prior to January 10, 1941). It was subsequent to that conversation in that office that the stock was turned over to Mr. Thomas. The doctor and I discussed the matter of these bad loans that the bank had. The names of Lutz and Hewitt are more or less familiar to me. The doctor was worried about those bad loans being made while he was president of the bank. Jack Kennedy* was put into the bank during the time the doctor was president. Those bad loans went through Kennedy's hands. All of them. The doctor's connection with the Service Mortgage Company was—his uncle owned it; I would say the controlling interest in it. I believe Dr. Buell and Mr. Kennedy organized it before Dr. Buell went into the bank. Well, I wouldn't know whose idea, Kennedy's or Dr. Buell's for sure. In any event, between the two of them they organized the Service Mortgage Company. The Service Mortgage Company's connection with the Orion Bank was—they made service loans or construction loans to the bank. They did handle those loans for the bank and made a fee or commission or something out of them."

---

* Jack Kennedy was one of the incorporators of the Service Mortgage Company.

Mr. Thomas, upon acquiring the majority of the common stock of the bank, promptly became the president and a director of the bank and started to take an active part in the management. Difficulty was at once encountered in collecting the "sour" commercial paper above referred to. Dr. Buell was called to the bank by the Federal and State examiners. On April 29, 1941, Mr. Thomas and the other 4 directors of the bank were called to Lansing by the State banking department and informed that unless the capital structure of the bank was improved by the addition of $42,000 within 24 hours the bank would have to close. Mr. Thomas testified as to what then occurred, as follows:

"When we left Lansing, we got in the car and came to Pontiac. We discussed on our way down that we couldn't raise it, we'd have to let it close, so we thought we should advise Dr. Buell we were going to have to let it close. Whereupon the five of us went to the office and told him we couldn't raise it, we'd have to let the institution close the following day, which the commissioner stated he would do. Mrs. Buell was present at that conversation. We told the doctor—Mrs. Buell was present— we had been handed that ultimatum and we discussed it on our way down and it was humanly impossible to raise that amount of money and that we possibly could raise the $22,000. However, Dr. Buell said, 'If you can raise that much, I will try to raise the rest, because I cannot afford to see that institution close, because' he said 'it will ruin my business and I cannot stand an investigation of the bank.'"

The common stock of the bank at that time was $25,800. Within the 24-hour time limit Mr. Thomas and the other directors (except Dr. Buell) raised $22,000 which was taken to the banking department by Mr. Thomas and deposited in escrow as a contribution to replenish the capital of the bank. Dr. Buell

discussed the matter with his attorney, told him that unless an additional $20,000 was raised at once the bank would be closed.  Dr. Buell told his attorney that "he couldn't let the institution close, because he didn't want an investigation of it.  And Harold Howlett (the attorney) said, 'Doctor, if you think, if you feel that way, you should put in that money, I'd say put it in.' "

Dr. Buell, by borrowing money and assigning 2 mortgages to the bank, raised $20,000 and turned it over to Mr. Thomas, who took it to the banking department.  The bank was allowed to continue in business.  Later, 30 shares of surrendered stock in the bank was transferred to Dr. Buell and his wife, and in 1947 she was given a stock dividend of 18 shares.  The bank remained open as a result of these contributions to its capital, and is still doing business.  No further demands were made on Dr. Buell, or the plaintiff, because of their connection with the bank.  The Doctor died by his own hand on July 15, 1941.  No further demands for contribution have been made against his estate.  Under Mr. Thomas's management the bank has prospered.

In 1942, plaintiff instituted an action against Mr. Thomas to set side the contract they had entered into with him on January 10, 1941, on the ground that Dr. Buell was mentally incompetent at the time it was made.  In that case the court, after hearing, found that Dr. Buell was not incompetent to enter into the contract whereby he transferred his stock to Mr. Thomas, and dismissed the bill of complaint. No appeal was taken.  About 2 years later the instant suit was started against the bank by the plaintiff, referred to in the opening paragraph of this opinion.

There is no question but that considerable testimony was adduced at the hearing indicating that Dr. Buell was mentally disturbed in 1940 and 1941 dur-

ing the period of his connection with the bank. He was a successful dentist, 40 years of age, when he chose to enter the banking business. He had been active in its management while he was the president, and had personally investigated many loans. He had been instrumental in placing Jack Kennedy in the employ of the bank, active in promoting commercial loans for the Service Mortgage Company. Late in 1940, it came to the attention of Dr. Buell that some of those loans, between $60,000 and $80,-000, were of questionable value. There is no doubt that Dr. Buell at that time became extremely worried about the condition of the bank. During that period of time there was a material change in his usual habits. He became suspicious, lost interest in his personal appearance, was careless and lost interest in his work as a dentist, frequently acted like a "whipped dog," thought he was going to be put in jail, became sleepless at night. He did many unusual and erratic things. He thought that people were spying on him, that dictaphones were in his house, neglected his children, had a persecution complex, thought he was going to be put in jail for something, would become hysterical over radio programs involving crime, thought he was equally guilty with those taking part in the radio programs, would cry, shake and pace the floor, did unusual things in connection with his practice of dentistry. There was an abundance of testimony tending to show the change in his usual state of mind and manner of living, probably the result of his knowledge of the financial condition of the bank and of his connection with it while he was the president and a director, and a feeling that he was responsible for the impairment of the bank's capital. However, the proofs fall short of establishing mental incompetency, and we are in accord with the conclusion reached by the trial court that the plaintiff failed to

establish by a preponderance of the evidence that Dr. Buell was mentally incompetent to enter into the transaction whereby he and Mrs. Buell contributed $20,000 to replenish the impaired capital of the defendant bank. The record shows that after he severed his connection with the bank in January, 1941, Dr. Buell continued to practice his profession and his income increased. In the first 6 months of 1941 his average monthly income increased to over $700. In April, 1941, within 3 days he had secured the $20,000 by borrowing on his life insurance policy, by the sale of stock, a mortgage on their home, and by transferring 2 other mortgages. So far as the record shows, his competence to make these transactions has not been challenged. The plaintiff herself individually participated, joined in the transfer of their stock to Mr. Thomas and in the contribution of $20,000 to the bank to replenish its capital, and there is no question raised as to her being mentally competent to do so. They consulted with and followed the advice of competent legal counsel. They sought, and so far as possible obtained from Mr. Thomas, protection against any personal liability resulting from Dr. Buell's participation in the impairment of the bank's capital while he was its president and a director.

We are impelled to the conclusion that the facts and circumstances do not indicate mental incompetence, but quite the contrary. Plaintiff and Dr. Buell voluntarily surrendered their stock to Mr. Thomas at a time when it had no value, due to the impairment of the capital of the bank, for the admitted purpose of escaping any liability which might arise through Dr. Buell's connection with the bank and its financial condition while he was the majority stockholder, a director, and the president in active management of its affairs. The statute provided that when the capital of the bank had become im-

paired Dr. Buell and his wife might have been required to meet the deficiency in the capital by payment of an assessment pro rata on the amount of the capital stock held by them, and the statute required the directors to levy such assessment. CL 1948, § 487.55 (Stat Ann 1943 Rev § 23.786). Furthermore, any officer or director of a bank who knowingly violates or permits any agent, officer or director of a bank to violate any provision of the financial institutions act or any valid rule or regulation of the commission* shall be personally and individually liable for all damages sustained by any shareholder or any other person in consequence thereof. CL 1948, § 487.76 (Stat Ann 1943 Rev § 23.826). The course pursued by Dr. Buell in attempting to escape such liability indicates a considerable degree of mental acuteness, rather than mental incompetence.

Plaintiff's counsel claims that the equities are with the plaintiff, that plaintiff should recover the $20,000 from the bank because it was paid in by Dr. Buell because of mental weakness, if he was not actually mentally incompetent. However, there are also equities in favor of the bank, and its depositors and creditors, as against Dr. Buell, who was entrusted with the management of their funds as president and a director of the bank. Nor is it shown here that requiring the bank to return the $20,000 to the plaintiff would not again result in an impairment of the bank's capital.

There is no evidence that the bank, or its directors, were guilty of fraud or "overreaching" either as to the plaintiff individually or as to Dr. Buell. Plaintiff and Dr. Buell were familiar with all the circumstances and voluntarily entered into the transaction with full knowledge of the facts. Nor is there merit

---

* PA 1937, No 341 (CL 1948, § 487.1 *et seq.* [Stat Ann 1943 Rev § 23.711 *et seq.*]).

in plaintiff's claim that the contribution of the money to the bank to replenish its capital was void because of failure of consideration. It is undisputed that other stockholders surrendered stock and made contributions toward the replenishment of the capital of the bank at the same time. Mutual contributions by other stockholders furnish a valid consideration for an agreement by the Buells for their contribution. *Conrad* v. *La Rue,* 52 Mich 83; *Better Business Bureau of Detroit, Inc.,* v. *First National Bank-Detroit,* 296 Mich 513. Furthermore, title to the $20,000, including the assignment of mortgages, passed from plaintiff to the bank, there was actual delivery, and it was accepted by the bank. If, as claimed by plaintiff, this was a gift to the bank, it was a valid gift under the circumstances, and no consideration would be necessary to its validity as between the donor and the bank.

"Three elements are necessary to constitute a valid gift. The donor must possess the intent to gratuitously pass title to the donee. *Chamberlain* v. *Eddy,* 154 Mich 593, 603, and *Geisel* v. *Burg,* 283 Mich 73, 80. An actual or constructive delivery is essential to effectuate a gift either *inter vivos* or *causa mortis. In re Van Wormer's Estate,* 255 Mich 399. In order for the gift to be consummated, the donee must accept it, although a gift beneficial to the donee will be presumed to have been accepted. *Holmes* v. *McDonald,* 119 Mich 563 (75 Am St Rep 430)." *Molenda* v. *Simonson,* 307 Mich 139.

"No consideration was necessary, for the mother was at liberty to make a gift by deed to the daughter." *Meade* v. *Robinson,* 234 Mich 322.

"The fact that it is a gratuitous transaction does not in any way deprive it of its character as a transfer of title." *Taylor* v. *Burdick,* 320 Mich 25.

Plaintiff argues that either the bank, or Mr. Thomas as a stockholder, would be unjustly enriched unless compelled to reimburse plaintiff for the $20,000 contribution. On that theory the plaintiff would also be "unjustly enriched" to the extent that she apparently still owns 25 shares of the common stock and 5 shares of the preferred transferred by the bank in 1941, and 18 shares of common transferred to the individual plaintiff in 1947 as a stock dividend. The defendant bank was not unjustly enriched. No person is unjustly enriched unless the retention of the benefit would be unjust. Restatement of the Law, Restitution, p 12.

"The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. * * * One is not unjustly enriched, however, by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution." 46 Am Jur, pp 99, 100.

The decree dismissing the bill of complaint is affirmed, with costs to appellee.

REID, NORTH, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred. DETHMERS, J., concurred in the result.