**ATLAS CONCRETE PIPE, INC., Plaintiff,**

v.

**ROGER J. AU & SON, INC., Defendant,**

v.

**MICHIGAN TESTING ENGINEERS, Third-Party Defendant.**

Civ. A. No. 77–40159.

United States District Court, E. D. Michigan, S. D.

March 6, 1979.

832

Stewart A. Newblatt, Flint, Mich., for plaintiff.

David A. Cuvrell, Flint, Mich., Trustee in Bankruptcy.

Kenney & Chapman, Troy, Mich., Joseph S. Radom, Detroit, Mich., G. Cameron Buchanan, Troy, Mich., Edward C. Baran, Mansfield, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

On October 6, 1970, plaintiff Atlas Concrete filed a complaint seeking damages for the alleged breach by the defendant Au of a contract for the sale of concrete pipe, as follows: (1) The alleged failure of Au to pay for pipe manufactured and delivered by Atlas to Au, and (2) the alleged failure by Au to install the pipe at the contract rate.

Au later counterclaimed seeking damages for the alleged failure by Atlas to deliver the pipe at the contract rate, to remove excess pipe from the job site, and to deliver certain manhole "T's", as well as for the alleged sale by Atlas of defective pipe. Subsequently, Au filed a third party complaint against defendant Michigan Testing Engineers seeking damages for the alleged failure by Michigan Testing to properly inspect the pipe in question. The third party complaint aspect was subsequently severed for separate trial and is not involved in this appeal.

Prior to the trial of this case in 1973, Atlas filed three motions for partial summary judgment seeking to dismiss the counterclaims against it by Au. These motions, which were decided by Judge Roth, were granted, and the counterclaims, as well as certain related defenses of Au, were dismissed. A motion for reconsideration of the foregoing decision was denied on the eve of trial. The case went to trial before Judge Roth in November of 1973. Judge Roth died before rendering a decision.

On March 15, 1974, Atlas filed for reorganization pursuant to Chapter X of the Bankruptcy Act. As a related matter, the contract action involved herein was referred by this Court to the Bankruptcy Court for retrial. Pursuant to stipulation of the parties, the Bankruptcy Court made its findings on the basis of the transcript of the proceedings before Judge Roth and limited documentary supplementation of the record.

Before making its findings, the Bankruptcy Court rendered, in substance, two decisions which were later the subject of an interlocutory appeal to this Court. First, the Bankruptcy Court denied Au's motion to set aside partial summary judgment granted Atlas by Judge Roth. Second, the Bankruptcy Court denied Au's motion to transfer the action to District Court for lack of subject matter jurisdiction in the Bankruptcy Court. On March 17, 1977, these rulings were affirmed on appeal by this Court.

Subsequently, on June 8, June 22, and October 18 of 1977, the Bankruptcy Court made the Findings of Fact which form the subject of this appeal. On October 18, 1977, judgment was rendered in favor of Atlas in the amount of $525,789.31.

## FACTUAL BACKGROUND

In early 1968, the Oakland County Department of Public Works submitted four specific contracts for sewer jobs in Oakland County for bids. Au was the successful bidder on one of these contracts. Atlas, a concrete pipe supplier, prior to the contract bid date, sent certain price information to the various contractors who had obtained copies of the plans, which prices, as it turned out, were 25% higher than those arrived at in the written agreement between the parties. Later, on July 2, 1968, after Au had been awarded the contract, Atlas sent Au a revised price list for the purpose of inviting Au to enter into negotiations to culminate in a contract for the sale of pipe. Significantly, the prices submitted in this list were the prices ultimately agreed upon by the parties in their written contract.

Between July 2 and July 15 of 1968, a meeting took place between representatives of Au and Atlas to discuss the terms of the prospective contract. At this meeting, Au sought and received from Atlas assurance that Atlas could deliver to the job site 600' of pipe per day. On the other hand, Atlas informed Au that, because Atlas was financing its operation primarily on borrowed capital, it would require payment for the pipe by Au within two days after Au had received payment for such by the County.

These considerations, as well as the price list of July 2, 1968, were incorporated into the written contract between the parties entered into on July 15, 1968. That contract had two key provisions which lie at the heart of this appeal:

(1) Atlas was required to supply 600' of pipe per day to the project; and

(2) Au was to pay for the product received within two days after it had been paid by the County.

As it later developed, neither of these provisions were complied with. As both parties concede, had Atlas delivered 600' of pipe per day to the project, Atlas would have completed its supply obligations by January of 1969. The last shipment of pipe, however, was not made until August, 1970. Further, by Au's own admission, assuming its defenses and counterclaims are without merit as determined by Judge Roth, Au owes Atlas $119,477.47 for pipe delivered by Atlas.

Atlas bases recovery of damages on three basic theories of contractual liability:

(1) Failure of Au to pay Atlas the outstanding open account indebtedness, that is, for all of the pipe delivered, accepted, and installed by Au;

(2) Breach of Au's implied promise to "call for" or install, the pipe at the rate of 600' per day; and

(3) Consequential damages in the form of interest Atlas had to pay its lenders for working capital needed because of Au's failure to pay the outstanding open account indebtedness.

The Bankruptcy Court found for Atlas on all of the foregoing theories of liability; as follows:

| | |
|---|---|
| Open Account Indebtedness | $193,148.63 |
| Breach of Implied Promise to install pipe at rate of 600' per day | 43,710.95 |
| Consequential Damages – Interest | 124,565.69 |
| Subtotal | $ 361,485.27 |

After adding certain items which are not seriously disputed and statutory interest, the Bankruptcy Court rendered judgment for Atlas in the amount of $525,789.31.

## ISSUES ON APPEAL

After carefully reading the briefs of the parties, the Court believes the real issues involved herein are as follows:

(1) What is the appropriate standard of review the Court should use to review the findings of the Bankruptcy Court;

(2) Should the findings of the Bankruptcy Court be reversed:

(a) Did the Bankruptcy Court properly compute the outstanding open account indebtedness;

(b) Did the Bankruptcy Court properly find that Au breached an implied promise to install pipe at the rate of 600' per day; if so, did the Bankruptcy Court properly compute damages based upon this breach;

(c) Did the Bankruptcy Court properly allow as consequential damages interest paid by Atlas for working capital required because of Au's failure to pay the outstanding open account indebtedness;

(3) Should the granting of partial summary judgment to Atlas by Judge Roth be set aside;

(4) Did the Bankruptcy Court have jurisdiction to hear the case; and

(5) Should the Atlas principals be added as third party defendants should the case be retried.

## DISCUSSION

### STANDARD OF REVIEW

■ Au's first argument on appeal is that the findings of the Bankruptcy Court should not be reviewed according to the "clearly erroneous" standard ordinarily applicable in bankruptcy appeals. See Bankruptcy Rule 811. By contrast, Au argues that this Court should review the record before Judge Roth and make findings based upon its own independent judgment. In this connection, Au asserts that the Bankruptcy Court made its findings on the basis of the bare transcript and exhibits before Judge Roth, without having the opportunity to observe the demeanor of the witnesses, and, therefore, that this Court is in as good a position to make findings as was the Bankruptcy Court.

Atlas responds that this argument is inconsistent with the plain language of Bankruptcy Rule 811. In this regard, Bankruptcy Rule 811 does not on its face indicate that there are any exceptions to the clearly erroneous standard of review.

Notwithstanding the plain language of Bankruptcy Rule 811, the Court believes that Au's position has merit. In *In Re Clemens,* 472 F.2d 939 (C.A. 6, 1972), the Sixth Circuit held, in a similar case, that where the Bankruptcy Court makes findings on the basis of a bare transcript of proceedings before another Court, the case is essentially a "paper case", without live testimony, and therefore, without special reason for giving deference to the findings of the Bankruptcy Court. This was so even though the parties had consented, as in this case, to the making of the findings on the basis of the bare transcript. Compare *In Re Anjopa Paper & Board Manufacturing Co.,* 269 F.Supp. 241 (S.D.N.Y., 1967); *Ramsey v. United Mine Workers of America,* 481 F.2d 742 (C.A. 6, 1973).

Accordingly, the Court will exercise independent judgment in reviewing the findings of the Bankruptcy Court. The Court believes, however, that the Bankruptcy Court served the important function of narrowing the issues between the parties.

### FINDINGS OF THE BANKRUPTCY COURT

#### A. *Open Account Indebtedness*

As indicated above, the Bankruptcy Court found that Atlas was entitled to damages for failure of Au to pay the outstanding open account indebtedness between the parties in the amount of $193,148.63. Having reviewed the evidence and made its own calculations, the Court believes that this finding should be affirmed.

This item of damages must be analyzed under two sub-categories:

(1) Failure of Au to pay for pipe delivered, accepted, and installed; and

(2) Failure of Au to pay for heavier grade steel than that called for by the contract used by Atlas in certain of its pipe.

Under the first sub-category of damages outlined above, failure to pay for the pipe itself, the Bankruptcy Court found Au owed Atlas damages in the amount of $178,022.63. In this regard, Au concedes it owes Atlas $119,477.47. Accordingly, in resolving this issue, the Court has focused on the arguments underlying the amount in dispute between the parties in this regard, $58,707.46.

The Court has carefully examined the evidence and made its own calculations in an effort to isolate the arguments which account for the amount in dispute. The amount in dispute can be explained as follows:

| | | |
|---|---|---|
| Credits for Pipe Returned Claimed by Au but Not Allowed by Atlas | $ | 73,777.16 |
| Amount Considered Owing by Au for Pipe Delivered but Not Billed by Atlas | | (15,063.10) |
| Subtotal | $ | 58,714.06 |
| Miscellaneous Adjustment | | (6.60) |
| Total | $ | 58,707.46 |

Turning to the first line above, credits claimed by Au but not allowed by Atlas, the only evidence introduced by Au that it is entitled to the credits is documentary evidence showing only that the pipe had been returned to Atlas after it had been delivered to the job site and had been accepted by Au.

■ This evidence is clearly insufficient to support Au's claim to the credits. In this regard, the burden is on Au under the Uniform Commercial Code (UCC), which is effective in Michigan and applies in this case, to establish that it has rightfully revoked its acceptance of the pipe. M.C.L.A. § 440.-2607(4). UCC 2–608 requires the buyer to comply with strict requirements in order to effectively revoke his acceptance. Significantly, revocation of acceptance is possible only where:

(1) The goods were accepted on the reasonable assumption that the non-conformity would be cured; or

(2) That non-conformity was not discovered at the time the goods were accepted, and acceptance was induced by either difficulty of discovery or by the seller's assurances.

Au introduced no evidence showing that the returned pipe was accepted under either of the foregoing conditions. As Au had the burden of proving the acceptance of the pipe was properly revoked, Au's claim for credit in this regard is accordingly rejected, and Atlas is entitled to recover its price. UCC 2–709(1)(a) & Official Comment 5.

The second line item, as indicated above, is the amount considered owing by Au for pipe delivered but not billed by Atlas. The Court notes that this amount, totalling $15,-063.10, is favorable to Au and not contested by Atlas. There is no dispute between the parties as to this line item.

Accordingly, as Au's argument against line one in the foregoing computation has been rejected, and there is no dispute between the parties as to the line two amount, the Court finds that Au's admitted liability of $119,477.47 should be increased by the total of lines one and two, or $58,714.06. To reconcile the figures of the parties, this amount should be reduced to $58,707.46. The Court, therefore, finds that Au owes Atlas $178,022.63 as open account indebtedness for the pipe itself under the first subcategory of damages outlined above.

Turning to the second sub-category of damages outlined above, the open account indebtedness for more expensive steel than that called for by the contract used in certain of the pipe, Atlas predicates liability in this regard on an alleged contractual obligation to pay for such created by certain correspondence between the parties after the formation of the contract on July 15, 1968.

On April 22, 1970, Au sent Atlas a letter requesting a change in the contract with regard to the quantity requirements of a certain sized pipe. Atlas replied stating that the change could be accommodated, but that a price increase would be involved because the only steel Atlas had available to manufacture the substituted requirements was a higher grade, and, therefore, more expensive than that asked for under the contract. On May 4, 1970, Au responded by informing Atlas of the details of the change, and by indicating that the new plans would be forwarded to Atlas. The pipe containing the more expensive steel was subsequently manufactured by Atlas and accepted and installed by Au.

■ The Court believes that the parties, by their words and conduct, modified the original contract to require a change in the quantity requirements and a related price increase for the higher grade steel Atlas

would have to use to accommodate the change. UCC Sections 2–204(1), (2) provide as follows:

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

In this connection, the official comment to the foregoing section provides in relevant part:

> "Under subsection (1) appropriate conduct by the parties may be sufficient to establish an agreement. Subsection (2) is directed primarily to the situation where the interchanged correspondence does not disclose the exact point at which the deal was closed, but the actions of the parties indicate that a binding obligation has been undertaken."

In this case, the correspondence of the parties does not indicate the exact point at which a deal had been closed. Nevertheless, Au requested a change in the contract, and, after having been informed that a price increase would be required, accepted and installed the pipe with the more expensive steel. The Court believes that by such conduct the parties have recognized the existence of a contract to pay for the higher grade steel.

Au's argument that such a modification of the contract violates the Parole Evidence Rule is without merit. The Parole Evidence Rule applies only to prior or contemporaneous agreements, not to subsequent modifications of the contract. UCC Section 2–202; See also UCC Section 2–209.

For the foregoing reasons, the Court finds that Au is indebted to Atlas for the cost of the higher grade steel, $15,126.00, which is reflected under the second sub-category of damages outlined above. Adding this to the damages previously determined by the Court for failure to pay for the pipe itself, under the first sub-category of damages outlined above, the Court finds the total open account indebtedness owing by Au to Atlas to be $193,148.63. The finding of the Bankruptcy Court in this regard is accordingly AFFIRMED.

### B. *Implied Promise to Install Pipe at Rate of 600′ Per Day*

The Court believes that, without question, this issue is the most conceptually difficult of those raised herein on appeal. Atlas predicates certain of its damages on an alleged breach by the defendant of an implied promise to "call for" or install the pipe in the ground at the rate of 600′ per day. In this connection, Atlas argues that the failure of Au to install the pipe at that rate has caused it the following damages:

| | | |
|---|---|---|
| (1) Interest on Pipe Stored in Yard | | $ 8,467.31 |
| (2) Increase in Labor Costs | | 4,758.15 |
| (3) Increase in Cost of Materials | | 30,485.49 |
| | Total | $43,710.95 |

Au responds to this argument by disputing the claim that it had an implied obligation to install the pipe at the rate of 600′ per day. Au argues, furthermore, that even if it had made such a promise, Atlas failed to comply with its part of the agreement to manufacture and deliver the pipe at the rate of 600′ per day.

The Court believes that the critical issue in this regard is whether Au, as Atlas contends, had an implied obligation to install the pipe at the rate of 600′ per day.

The written contract between the parties clearly does not require Au to call for and install the pipe at the rate of 600′ per day. It requires, by contrast, only that Atlas deliver to the job site 600′ of pipe per day and to string the pipe along the projected pipeline.

An apparent misunderstanding developed between the parties at the time of the contract as to the rate at which the pipe would be installed by Au. Au contemplated that the pipe would be installed at the rate of 200′ per day; the pipe would be delivered to the job site at the greater rate of 600′ per day to assure that its work crews had an adequate supply and to get the pipe to the

job site before the winter months set in. On the other hand, Atlas assumed, incorrectly as it turned out, that the pipe would be installed at the rate it would be delivered.

The rate of installation was important to Atlas. As indicated earlier, Atlas would not receive payment for the pipe until Au was paid by the County, which was not until after the pipe had been installed. Because Atlas was operating primarily on borrowed capital, it needed a quick liquidation of its inventory into cash in order to operate successfully. When it became apparent that Au was not going to install the pipe at the rate of 600′ per day, Atlas delivered to the job site at a rate roughly at the same rate it was being installed by Au. By operating in this manner, Atlas would avoid having its capital tied up in inventory awaiting installation by Au.

Various theories have been used in the briefs and the findings of the Bankruptcy Court to find an obligation on the part of Au to call for and install the pipe at the rate of 600′ per day. Each of these theories is without merit.

Atlas' primary theory in this regard is that the parties had a contract implied in fact requiring that the pipe be installed at the rate of 600′ per day. As the Court indicated above, UCC 2–204 provides that a contract may arise in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a contract.

The subsequent conduct of the parties certainly did not recognize the existence of a contract to install the pipe at the rate of 600′ per day. At no time during the project did Au install pipe at this rate.

■ For the Court to find on this theory, it must find that Au made an implied promise to call for and install the pipe at the rate of 600′ per day, which was breached on the first day of the project. In this regard, the Court will imply a promise from any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for a requested act or a requested promise by the offeree. Williston, *Law of Contracts*, Section 36 (3d Ed., 1957); Fuller & Eisenberg, *Basic Contract Law*, at 36 (3d Ed., 1972). The factual basis for the inference of a promise varies with each case, and generalizations are perilous. *Keyes v. Scharer*, 14 Mich.App. 68, 165 N.W.2d 498 (1968). The inference of a promise may sometimes be properly determined by subsequent conduct of the parties. *Keyes v. Scharer, supra.* See also *Daniels v. Goodwin Pontiac Co.*, 348 Mich. 121, 82 N.W.2d 444 (1957); *Tustin Elevator & Lumber Co. v. Ryno*, 373 Mich. 322, 129 N.W.2d 409 (1964); *Thompson v. Auditor General*, 261 Mich. 624, 247 N.W. 360 (1933).

■ The Court has reviewed the evidence and can find no conduct on the part of Au which would create in Atlas, the alleged offeree, the reasonable expectation that Au promised to install the pipe at the rate of 600′ per day. Atlas' primary argument that such an expectation was created is that Au knew that Atlas was financing its operation primarily on borrowed funds and knew that Atlas could not afford to keep its inventory unliquidated for more than a short period of time. Atlas argues that, with this knowledge, it could have expected Au to disclose that it would not install the pipe at the rate of 600′ per day. Accordingly, Atlas argues that by failing to disclose the true rate of installation, Au created the reasonable expectation in Atlas that the pipe would be installed at a rate of 600′ per day.

This argument is flawed in several respects. The most significant flaw is that before the delivery rate of 600′ per day was required by Au, Au had received a revised price list from Atlas on July 2, 1968, which, as indicated earlier, was the price list eventually incorporated into the final contract. Au had no reason to expect, therefore, that an installation rate of 600′ per day was a factor in Atlas' pricing decisions and, therefore, had no good faith obligation to disclose that the pipe would not be installed at a rate of 600′ per day. As Atlas could have had no reasonable expectation that Au

would have disclosed its intended installation rate, Au's failure to disclose the intended rate of installation could not have created in Atlas the reasonable expectation that the pipe would be installed at the rate of 600′ per day.

A second flaw in this argument is that Atlas had access to the projected date of completion of the project, initially, December 31, 1969. This date was contained in the specifications to the project, incorporated by reference in the written contract between the parties of July 15, 1968. Although Atlas requested, but did not receive, from Au its production schedule, the failure to know Au's precise production schedule could not have altered the basic fact, incorporated into the contract, that this was approximately a year and half project. In light of this fact, it is inconceivable to this Court how Au's failure to disclose its intended rate of installation could have created the reasonable expectation in Atlas that the pipe would be installed at the rate of 600′ per day. At such a rate of installation, as Atlas well knew, the project would have been completed in mid-January of 1969, a date totally inconsistent with the completion date provided for by the specifications, and incorporated by reference into the contract.

Other facts relied on by Atlas in support of the foregoing argument are similarly unpersuasive. Atlas relies on the deposition of a Mr. Bell, Au's job superintendent, which reflects that at the time of the contract Au contemplated an installation rate of 600′ per day. This testimony is not only inconsistent with Mr. Bell's testimony at trial, but also with the testimony of Charles Au, Au's president, who stated that the delivery requirements were needed to assure that Au would always have an adequate supply of pipe.

Atlas also relies on the practical working arrangement between the parties during the project, in which Au would notify Atlas daily of its pipe requirements for the following day, to support the 600′ installation requirement. The Court believes that this reflects a reasonable business practice between the parties as a result of Atlas' failure to deliver to the project, as required, 600′ of pipe per day. This may have operated as a waiver of the requirement to deliver 600′ pipe per day to the project, but the Court does not believe that such could provide the basis of a requirement to install the pipe at the rate of 600′ per day, nor to pay the increased costs incurred by Atlas to produce the pipe. See UCC Sections 2–204, 2–209.

The Court has considered other possible theories of relief for Atlas which are obliquely referred to in the briefs and the findings of the Bankruptcy Court. These consist, in substance, of misrepresentation and quasi-contract. Both are without foundation in this case.

In Michigan, in order to recover for misrepresentation, there must, in general, be a misrepresentation of a present existing or past fact, not of a future promise. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813 (1976). An exception to this rule exists where one makes a future promise in "bad faith," that is, without intention of performing it at the time the promises were made. *Hi-Way Motor Co. v. International Harvester Co., supra.* This theory is without application in this case because the alleged obligation to install 600′ of pipe per day relates to a future promise and there is no evidence to suggest that, assuming the Court were to find that such a promise had been made, it was made in "bad faith."

The Court has also considered recovery by Atlas on a theory of quasi-contract. Under this theory, even though there is no basis for implying a contract in fact between the parties, the Courts will imply a "contract-in-law", or a quasi-contract, where justice so requires. See *Moll v. Wayne County*, 332 Mich. 274, 50 N.W.2d 881 (1952); *Buell v. Orion State Bank*, 327 Mich. 43, 41 N.W.2d 472 (1950); *Huntley v. Gunn Furniture Co.*, 79 F.Supp. 110 (W.D. Mich.,1948); *City of Detroit v. City of Highland Park*, 326 Mich. 78, 39 N.W.2d 325 (1949); *Cascaden v. Magryta*, 247 Mich. 267, 225 N.W. 511 (1929). Although application

of the theory is basically undefined, it has been used primarily to prevent the "unjust enrichment" of the opposite party. See Williston, *Law of Contracts*, Section 3 (3d Ed., 1957). For obvious reasons, the theory has been used with caution. *Cascaden v. Magryta, supra.*

The essential elements of a quasi-contractual obligation, upon which recovery may be had, are (1) the receipt of a benefit by the defendant from the plaintiff, and (2) which benefit it is inequitable that the defendant retain. *Moll v. County of Wayne, supra*, 332 Mich. pp. 278–79, 50 N.W.2d 881. In this case, Au has received no benefit which is "inequitable" for it to retain. If Au received any benefit as a result of its failure to install the pipe at the rate of 600′ per day, it was pipe at a price below Atlas' cost. This was primarily the result of arm's length bargaining between the parties, two corporations knowledgeable in the trade and of relatively equal bargaining power. It was not, by contrast, the result of any colorable misconduct on the part of Au. Further, there was no gross disparity between the value given up by Atlas and the value received. For these reasons, the Court does not feel that it is inequitable to allow Au to reap the fruits of a good bargain and, accordingly, will not imply a quasi-contractual obligation on the part of Au to install the pipe at the rate of 600′ per day.

For similar reasons, the related argument of Atlas based on "unconscionability" is rejected as well. UCC Section 2–302.

For the foregoing reasons, the finding of the Bankruptcy Court that Atlas is entitled to recover from Au damages in the amount of $43,710.95 for failure of Au to "call for" or install the pipe at the rate of 600′ per day is REVERSED. Atlas is not entitled to any damages in this connection.

### C. *Consequential Damages—Interest on Open Account Indebtedness*

Au also challenges the finding of the Bankruptcy Court that Atlas is entitled to consequential damages in the amount of $124,565.69. (In response to an inquiry from the Court to plaintiff's counsel concerning the derivation of this figure, plaintiff's counsel stated by way of a written memorandum that the aforementioned amount is incorrect and that the correct figure should be $116,428.59.) This amount represents the alleged interest Atlas was required to pay for borrowed working capital needed because of Au's failure to pay the outstanding open account indebtedness.

Atlas argues in this connection that Au was specifically informed that Atlas was operating on borrowed capital and that this was the reason for the requirement that Au was required to pay Atlas two days after it received payment from the County. Atlas contends, therefore, that it was in the reasonable contemplation of the parties at the time of the contract that Atlas would be required to incur interest expense to obtain working capital if Au breached its payment obligations under the contract. Atlas predicates recovery of the interest expense incurred on the doctrine of the landmark case of *Hadley v. Baxendale*, 9 Exch 354 (1854), which holds that a party may recover such consequential damages for breach of contract as may reasonably be supposed to be in the contemplation of the parties at the time of the contract, as the probable result of the breach of the contract, and may include damages arising from the special circumstances of the aggrieved party known and communicated to the breaching party. The doctrine has, under various interpretations, been followed by virtually all the courts in the country, including those in Michigan. See *Miholevich v. Auto Insurance Co.*, 261 Mich. 495, 246 N.W. 202 (1933); *Frederick v. Hillebrand*, 199 Mich. 333, 165 N.W. 810 (1917); *Hopkins v. Sanford*, 38 Mich. 613 (1878).

Au responds to this argument by challenging the factual basis for application of the theory in this case, as well as by relying on the generally discredited view of the *Hadley v. Baxendale* doctrine espoused in *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1902). See White and Summers, *Uniform Commercial Code*, Section 10–4 (1972);

UCC Section 2–715(2), Official Comment No. 2. Au also challenges the mathematical accuracy of the computation of the interest expense by Atlas, as well as the rate used by Atlas to compute the interest expense.

For reasons that follow, the Court agrees with Atlas that incidental damages in the form of interest paid by Atlas to obtain working capital required as a result of the failure of Au to pay the outstanding account indebtedness should be recovered. The analysis in this regard properly focuses on the Uniform Commercial Code. UCC Section 1–106 provides that "the remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had performed . . ." In this regard, the official comment to this section provides in relevant part:

> "the third purpose of (the above-quoted provision) is to reject any doctrine that damages must be calculable with mathematical accuracy. Compensatory damages are often at best approximate: they have to be proved with whatever definiteness the facts permit, but no more."

The applicable section for the recovery of damages by Atlas for the failure of Au to pay for the goods accepted, UCC Section 2–709, provides, in relevant part, as follows:

> "(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any *incidental* damages under the next section, the price
> "(a) of goods accepted . . ." (emphasis added).

Incidental damages are defined in UCC Section 2–710 as follows:

> "Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

The purpose of this section is explained in the official comment:

> "To authorize reimbursement of the seller for expenses reasonably incurred by him

as a result of the buyer's breach. The section sets forth the principal normal and necessary additional elements of damage flowing from the breach but intends to allow all commercially reasonable expenditures made by the seller."

It is readily apparent to this Court, therefore, that the critical issue is whether the interest expense incurred by Atlas for failure of Au to pay the open account balance is properly characterized as "incidental damages." To this end, the Court must inquire whether the interest expense in question was a commercially reasonable expense reasonably incurred by Atlas as a result of Au's failure to pay the outstanding open account indebtedness. The Court notes, in this connection, that an inquiry based on "consequential damages", or what damages were within the reasonable contemplation of the parties at the time of the contract, is not authorized where the seller seeks to recover for breach by the buyer. UCC Section 1–106; 2–709; see also UCC Section 2–715(2).

The Court believes that, without question, the interest expense in question was a commercially reasonable expense reasonably incurred by Atlas as a result of Au's failure to pay the outstanding open account indebtedness of $193,148.63. At the time Atlas filed suit in 1970, Atlas was a viable pipe manufacturing company operating primarily on borrowed capital. As a result of Au's failure to pay the outstanding open account indebtedness, Atlas was required to borrow funds in that amount which it would not have otherwise been required to borrow. Because Atlas, over time, became an increasingly poorer credit risk, the cost of borrowing the capital became substantial, the rate of interest ultimately reaching 15.6%, compounded monthly. This expense was not only reasonable, but absolutely necessary to Atlas' existence. By carrying this account receivable, Atlas was, in substance, financing Au's operation for a period of about four years until Atlas filed for bankruptcy. As Charles Au testified, however, this was directly contrary to

the intentions of the parties. The Court believes that it is entirely proper that Au should pay for the expense incurred by Atlas to finance Au's operation in this regard.

The objections of Au relating to the high rate of interest paid by Atlas and to the inability to correlate directly the interest obligations of Atlas with Au's open account indebtedness are meritless. As reflected above, the remedies provided by the Code are to be liberally applied to place the aggrieved party in the position he would have occupied had the contract not been breached. See UCC Section 1–106 and the official comment thereto. This policy would be ill-served by requiring precise mathematical correlation of the open account indebtedness with interest expense incurred by Atlas, or by compensating Atlas at a rate below the rate of interest actually incurred.

For the foregoing reasons, the finding of the Bankruptcy Court that Atlas is entitled to recover $124,565.69 as interest expense incurred by Atlas on the outstanding open account indebtedness is MODIFIED. In accordance with the recomputation of this figure submitted to the Court by Atlas' counsel, the Court finds that Atlas is entitled to recover in this connection $116,-428.59.

REMAINING ISSUES: PARTIAL SUMMARY JUDGMENT, JURISDICTION, ATLAS PRINCIPALS AS THIRD PARTY DEFENDANTS.

As reflected at the outset, these issues were the subject of an interlocutory appeal to this Court on March 17, 1977. The Court found against Au on each of these issues therein, and that decision is now REAFFIRMED.

SUMMARY

In accordance with the foregoing discussion, the findings of the Bankruptcy Court are MODIFIED as follows:

| | |
|---|---|
| Open Account Indebtedness | $ 193,148.63 |
| Breach of Implied Promise to Install Pipe at Rate of 600′ per day | – 0 – |
| Incidental Damages – Interest | 116,428.59 |
| Subtotal | $ 309,577.22 |

After adding the items not seriously disputed and statutory interest, the Court finds that the judgment of the Bankruptcy Court should be reduced from $525,789.31 to $452,001.86.

The Clerk is accordingly directed to enter judgment for Atlas in that amount plus costs.

IT IS SO ORDERED.