WAGONER *v.* WAGONER.

1. DIVORCE—VALIDITY OF MARRIAGE—PRESUMPTIONS.

In a suit for divorce, it appeared that a former husband of complainant left his home and went to another State some 16. years previously, saying that he would either return or send for her; that he had chronic diarrhea when he went away, and shortly afterwards, in response to letters of inquiry, she learned that he was ill; that she never again heard of him; and that, three years after his departure, believing him to be dead, she married defendant. *Held,* insufficient to overthrow the presumption of the validity of the second marriage.

2. SAME—ALIMONY.

Where, in a divorce case, the testimony as to the husband's property was unsatisfactory, but it appeared that he withdrew some $1,500 from a bank shortly before the suit was commenced, and he admitted having other property worth $800, an award of $600 permanent alimony was not excessive.

Appeal from Bay; Shepard, J. Submitted October 10, 1901. Decided November 12, 1901.

Bill by Martha A. Wagoner against James W. Wagoner for a divorce. From a decree for complainant, defendant appeals. Affirmed.

*James T. Lawler,* for complainant.

*Hurdis M. Ready* ( *Simonson, Gillett & Clark,* of counsel ), for defendant.

MOORE, J. The complainant filed a bill against defendant, alleging extreme cruelty, and praying for a divorce and permanent alimony. The circuit judge rendered a decree in accordance with the prayer of the bill. The defendant has brought the case here by appeal. He alleges the proofs do not show a case of extreme cruelty. We cannot agree with him. It would profit no one to repeat the

testimony here, but we think it clearly justifies the conclusion of the circuit judge that defendant was guilty of extreme cruelty.

It is alleged by way of defense that, when the parties to this action were married, the complainant had a living husband, and that defendant never was her husband. In this connection it becomes necessary to make a statement of the substance of the testimony. In May, 1883, the complainant, whose name was then Martha A. Harris, married one Hampton, and lived with him, keeping house at Saginaw, Mich. Their relations were pleasant. Hampton was a plasterer by trade. About 15 months after his marriage he went to a point near Louisville, Ky., for the purpose of getting employment. The arrangement with his wife was that he would either return to Saginaw, or send for her to come to him. He had chronic diarrhea when he left home. His wife did not hear from him after he went South, and she sent letters of inquiry, in reply to one of which Mrs. Haines wrote her from Louisville, Ky., saying her husband had been there and was sick, and told her if he did not get better in a few days he was going back home. In reply to later letters Mrs. Haines wrote she had not again seen or heard from Mr. Hampton. He never returned to Saginaw, and complainant testified she supposed he was dead. In 1887 the defendant began to pay attention to Mrs. Hampton. She testified that, in reply to an inquiry from him where her husband was, she told him she supposed he was dead; that she had not heard from him since he went away, and the only news she had of him was that he was sick, and told the circumstances of his going away; and Mr. Wagoner agreed with her, after she told him what she knew about Mr. Hampton, that he must be dead. She testified that, at the earnest solicitation of defendant, on Christmas day, 1887, she married him. The marriage ceremony was performed by a minister of the gospel, and the parties lived and cohabited together as husband and wife until March, 1900. Mr. Hampton had not returned to Michi-

gan when the case was tried in the court below, and his wife never heard from him after he left Saginaw. Upon this statement of facts, can it be said the second marriage was invalid, and the court was not authorized to grant a decree of divorce?

In the case of *Kelly* v. *Drew*, 12 Allen, 107 (90 Am. Dec. 138), the question arose as to whether the second marriage of a woman was valid, where she had lived separate from her first husband for about 4 years without hearing of him or his death at the time of her second marriage, and did not hear of him for 16 years afterwards. It was held the presumption was she was the lawful wife of the second husband. Justice Gray, speaking for the court, said:

"The state of facts offered to be shown by the witness was only that more than 20 years ago she was married to another man, and lived with him for a few months, and about 4 years afterwards married the defendant, without having heard of her first husband's death. No evidence was offered that the first husband had been heard from for 20 years, or that he had not died or been divorced from her before her second marriage. Under the circumstances of this case, the presumption of the wife's innocence in marrying again might well overcome any presumption that a man not heard from for 4 years before the second marriage, or for 16 years afterwards, was alive and her lawful husband when she married the second time. *Rex* v. *Inhabitants of Twyning*, 2 Barn. & Ald. 386; *Lapsley* v. *Grierson*, 1 H. L. Cas. 505; *Loring* v. *Steineman*, 1 Metc. (Mass.) 211; *Town of Greensborough* v. *Town of Underhill*, 12 Vt. 604."

In the case of *Wilkie* v. *Collins*, 48 Miss. 496, a husband left his home in Mississippi on October 30, 1859, and went to Louisiana on business, where he was last heard from by letter to his wife written November 30th of the same year, in which he said he was sick in bed, and would return as soon as able to travel. He did not return, and the wife, believing him dead, married again December 22, 1861. The absent husband was never heard of alive. The question arose, Was the second marriage valid? In deciding the case the court used the following language:

"About two years after Roberts left home, Mrs. Roberts married Wilkie. There is always a presumption that every individual conforms his conduct to the requisitions of duty, as prescribed by law. It belongs to universal jurisprudence that innocence of an act which the law forbids and denounces as criminal shall be presumed. Therefore, if a man or woman contracts a marriage in due form, the presumption is that the marriage is legal; that is, that there was no legal impediment in the way. It was very properly said in *Powell* v. *Powell*, 27 Miss. 785, that the 'law favors marriage,' and 'requires clear testimony to invalidate it.' The superstructure of society rests upon marriage and the family as its foundation. The social relations and the rights of property spring out of it and attach to it,—such as dower, administration, distribution, and inheritance. All controversies, therefore, growing out of marriage, assume the dignity and importance of *quasi* public questions.

"The marriage of Mrs. Roberts with Wilkie is said to be bigamous, because, at the time it was contracted, Roberts had not been absent for five consecutive years without being heard from, and therefore the presumption did not arise that he was dead. Rev. Code 1857, p. 577, art. 29. The precise fact to be ascertained is whether Roberts was living when Mrs. Roberts was married the second time. If no other fact appeared but simply the marriage, the presumption is in favor of validity. But there is also a presumption in favor of the continuance of life, which is only overcome by a protracted absence for the time specified. In such circumstances, founded on considerations of policy, and in favor of innocence, the presumption in favor of the marriage will prevail, as against that of the continuance of life, and it will devolve upon the disputant of the marriage to overcome it by testimony that the first husband was living at the time of the second marriage. 1 Greenl. Ev. § 35; *Rex* v. *Inhabitants of Twyning*, 2 Barn. & Ald. 386. In *Rex* v. *Inhabitants of Harborne*, 2 Adol. & E. 540, it was proved that a letter had been written by the first wife, from one of the colonies, only 20 days before the husband married the second time. This was deemed sufficient to warrant the presumption that the wife was living.

"The case reported in 2 Barn. & Ald. *supra*, arose in respect to a settlement in the parish. The woman, 12 months after the husband was last heard from, married a second husband, by whom she had children. It was

held that it was rightly presumed that the first husband was dead at the time of the second marriage. This application of the principle was accepted and adopted in *Spears* v. *Burton*, 31 Miss. 547. The action was ejectment. The title was claimed by descent, cast upon the issue of the marriage, which was impugned as illegal because the marriage with Burton, the plaintiff's father, took place within five years after the desertion of Bayard, the first husband; therefore there was no presumption of his death, and it was incumbent on the plaintiff to prove his death. The court, however, affirm the rule to be that the presumption is that the marriage was valid, and the *onus* was upon the defendant to show the contrary by proving the first husband living at or shortly before the date of the second marriage. *Gibson* v. *State*, 38 Miss. 322, was a prosecution for bigamy. The court declare that there is no difference between the civil and criminal consequences when the fact of marriage in due form of law has been proved.

"The presumption in favor of the marriage of Mary Elizabeth with Wilkie is greatly sustained and aided by the testimony. It was in evidence that her relations with her first husband, Roberts, were agreeable and pleasant; that he left home in the fall after the marriage to go to Louisiana on business; that he wrote several times to his wife. The last letter, written from a sick bed, stated that so soon as he recovered he would return home. He was represented as a delicate man, in feeble health. The correspondence suddenly ceasing, and Roberts not being heard from for quite a year, when Mrs. Roberts married again, begets the strong impression that his feeble frame succumbed to the disease which was upon him when he wrote the last letter to his wife, and that when she married Wilkie she was a widow. Such was the belief of the family. Connect this part of his history with the further circumstance that the other contestant offered no testimony that Roberts was ever afterwards heard of by his family connections and friends, and the inference is legitimate and strong that he died about the time supposed by his wife. The controversy originated about this administration in 1871,—11 years after Mrs. Roberts supposed that her husband had died, and about 9 years after she had married Wilkie, the intestate; and yet in this long interval nobody has ever heard of him alive. At the time of Mrs. Roberts' second marriage, the facts shown in evi-

dence were sufficient to satisfy her that her first husband was dead. Acting on that belief, she married a second time. The last marriage cannot be invalidated except by proof that the first husband was living at the time, or so shortly before as to put upon her the necessity of proving his death."

This case would seem to be on all fours with the case at bar. See *Yates* v. *Houston*, 3 Tex. 433; *Carroll* v. *Carroll*, 20 Tex. 731; *Canady* v. *George*, 6 Rich. Eq. 103; *Cartwright* v. *McGown*, 121 Ill. 388 (2 Am. St. Rep. 105); *Boulden* v. *McIntire*, 119 Ind. 574 (12 Am. St. Rep. 453); *Johnson* v. *Johnson*, 114 Ill. 611 (55 Am. Rep. 883).

The only remaining question calling for discussion is, Did the court err in the amount of permanent alimony he decreed? The testimony in relation to the amount of property owned by defendant is very unsatisfactory. This case was commenced on the 21st day of April, 1900. It was shown by the cashier of the Bay City Bank that on the 9th of April the defendant drew from that bank deposits amounting to $1,484.78, and that he made no deposits after that date. It was also shown that he had a quantity of real estate. The defendant offered no testimony in the court below, but he was called as a witness by the complainant, who attempted to show by him what property he had. His answers were not frank, and, after some questions had been put to him, his counsel objected to his further examination, and the court sustained the objection. A stipulation is attached to the record stating that affidavits were filed upon the hearing of the application for temporary alimony stating that defendant's real estate was worth not more than $660, and his personal property not more than $150, and that he had no money in any of the banks of Bay City. The circuit judge allowed complainant $600 permanent alimony. In view of the situation of the record, we are not prepared to say this is excessive.

The decree of the court below is affirmed, with costs.

MONTGOMERY, C. J., HOOKER and LONG, JJ., concurred. GRANT, J., did not sit.