YOUNG, J.
(dissenting). Because of the danger of unintended consequences and the difficulty that a court has in assessing them when amending the common law, the Hippocratic admonition to “first do no harm” is a wise prescription for restraint. It is an admonition that the majority today unfortunately ignores. Because the tenets of property law at issue here are among the most settled and uncontroversial in all of our jurisprudence, I vigorously dissent from the majority’s sweeping modification of the common law in this case.[1]
Under the banner of equity, the majority today creates a rule that renders Michigan the one place in the common law world where a tenant by the entirety can now be liable for contribution to his deceased spouse’s estate. This distinction is a dubious honor. For hundreds of years, the tenancy by the entirety with its *69 concomitant right of survivorship has existed as a means of protecting and fostering marriage, allowing a husband and wife to manage their property and assign financial equities as they saw fit, free from interference by third parties.
With its decision today, the majority now permits posthumous collateral attacks on the validity of marriages in this state where neither spouse has taken the appropriate legal steps to challenge the marriage or the financial equities of the marriage during life. In doing so, the majority ignores the perfectly adequate legal remedies that our Legislature created in specific contemplation of marital disharmony — specifically, an action for separate maintenance — instead preferring to craft a new remedy recognized nowhere else in the country. This rule allowing contribution between tenants by the entirety outside the context of a divorce or separate maintenance action is not supported by a single case or authority from any jurisdiction, let alone authority from Michigan. As such, the new rule the majority creates today is untested and holds unforeseen consequences that reach much further than the narrow and unassuming decision the majority believes it has issued in this case. Moreover, although in today’s decision the husband is required to make a contribution on marital property held by the entirety, given the fact that men still generally contribute more to family assets than women, I fear that the majority’s new rule may have a disproportionate adverse effect on women in the future.
Until today, Michigan law did not recognize the right of contribution between tenants by the entirety outside the context of the divorce or separation actions, and accordingly, I believe that Janet Mandeville’s estate does not have a cognizable claim for contribution to *70 pursue against Frank Mandeville, the defendant. Simply put, under Michigan’s settled law, a tenant by the entirety is not unjustly enriched when he takes sole ownership by operation of law over property that he previously owned with his spouse. The tenancy by the entirety is a unique incident of marriage. How married people choose to arrange their finances is varied and entirely a product of their determination. After a spouse’s death, it is difficult for a court to assess any alleged inequity in the contributions of the respective spouses that they failed to address during the marriage itself. Indeed, there is a great danger in authorizing post hoc judicial inquiries concerning how a husband and wife choose to structure their marriage, as the majority authorizes in this case. Rights created by a tenancy by the entirety, being anchored in marriage, are not affected where one spouse makes greater contributions to acquiring or maintaining the property, and thus no inequities arise that would compel restitution by a surviving spouse. Where spouses do not avail themselves of the legal means of disaggregating their interests in property owned by the entirety, the courts should not be authorized to do so after one spouse dies.
I. PRINCIPLES OF LAW AND EQUITY
Because I believe that the majority’s opinion is contrary to and undermines settled principles of law and equity, I begin my analysis with an examination of the legal principles underlying this action.
A. THE LAW OF TENANCY BY THE ENTIRETY
Michigan’s law of estates and its rules governing concurrent estates is derived from the English common law, although much of this law has now been codified by *71 statute.[2] Generally, there are three types of concurrent estates: the tenancy in common, the joint tenancy, and the tenancy by the entirety.[3] The parties do not dispute that the facts of the instant case and the issues they raise implicate only this last type of estate: the tenancy by the entirety.
A tenancy by the entirety is a type of concurrent ownership in real property unique to married persons.[4] *72 A tenancy by the entirety represents a legal policy arising from the English common law whereby a husband and wife each have a sole tenancy in the real property acquired during the course of the marriage. Like many of our laws, the unique nature of this estate has a unique presumption: at common law, a husband and wife were recognized as but one legal person, and thus their ownership of real property reflected this unique status.[5] A conveyance to a husband and wife that shares the unities required for joint possession[6] presumptively creates a tenancy by the entirely unless the conveyance otherwise explicitly indicates that the parties intend to create a separate type of estate.[7] Consistent with the historical practice, under Michigan *73 law one tenant by the entirety holds no legal interest in the realty separable from that of the other tenant.[8] Because of this legal presumption, neither spouse can act unilaterally to convey or alienate any portion of an interest in the property.[9] As this Court has stated: “When the husband and wife have thus together acquired an unencumbered title to real estate[,] they have laid up treasures, where, without their concerted action, neither moth, nor rust, nor thieves, nor creditors, nor anything else but death or the tax gatherer can divest them.”[10] In sum, each spousal tenant is vested with the entire title, and thus each tenant paradoxically holds complete, sole ownership jointly with the other tenant.
The most important feature of a tenancy by the entirety is the right of survivorship. This right provides that in the event that one spouse dies during the course of the marriage, the surviving spouse automatically takes fee simple ownership in the entire property.[11] Thus, this type of property is not a part of the decedent’s estate, and the laws of descent and distribution do not apply.[12]
*74 A tenancy by the entirety can only be terminated in limited, specific ways. The death of one of the tenants, a joint conveyance of the property, a creditor’s action against both cotenants, or a dissolution of the tenants’ marriage all operate to terminate a tenancy by the entirety. As stated, the death of one of the tenants automatically passes sole title to the remaining tenant through the right of survivorship. A conveyance executed by both tenants transfers title and ownership to new grantees of the property under whatever form of estate the grantees choose. Consistent with the concept that both cotenants must act to encumber a tenancy by the entirety, a creditor’s action against both a husband and wife who have together encumbered their property may terminate the tenancy.[13] Finally, in divorce proceedings after a marriage has been terminated, property held as a tenancy by the entirety becomes a tenancy in common unless the parties or the court terminating the marriage provides otherwise.[14] During this time, as is consistent with divorce proceedings generally, the court equitably divides all marital property, including real property that had been held as a tenancy by the entirety.
B. THE RIGHT OF CONTRIBUTION AND CLAIMS FOR UNJUST ENRICHMENT
The doctrine of equitable contribution has evolved from the common law and is “founded on principles of equity and natural justice.”[15] It provides that one who pays or satisfies “the whole or [bears] more than his aliquot share of the common burden or obligation, upon *75 which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares.”[16] Thus, where contribution is appropriate to reach an equitable result, the party seeking contribution may recover the proportionate share from each of the joint obligors.[17]
Regarding concurrent estates, claims for contribution are generally available to cotenants who hold real property as tenants in common or joint tenants.[18] As this Court held in Strohm v Koepke, which acknowledged the right of equitable contribution for tenants in common, “[t]he doctrine of contribution between cotenants is based upon purely equitable considerations.”[19] However, neither Michigan’s statutory law nor any decision by this Court or any Michigan court has ever specifically recognized the right of contribution for a husband and wife who hold their property as a tenancy by the entirety.
Even though a tenancy by the entirety resembles a joint tenancy, a tenancy by the entirety is not a joint tenancy; rather, it is a type of sole tenancy.[20] Our law has recognized important distinctions among these co-tenancies, providing rights and responsibilities to some *76 but not others. For example, joint tenants and tenants in common have a statutory right of partition; tenants by the entirety do not.[21] Also, joint tenants and tenants in common may unilaterally convey their property rights for any reason; tenants by the entirety may not.[22] These distinctions and others represent a type of severability among other concurrent estates not permitted in a tenancy by the entirety.
This understanding is in accord with the historical tradition of the tenancy by the entirety, because it has been inextricably tied to marriage.[23] At common law, where the law viewed a married couple as a single legal person, there was no legal need to allow recovery or contribution by one tenant essentially against himself. By contrast, other types of cotenancies among nonmarried persons — whether they are two or more relatives, Mends, business partners, or any other combination of individuals who may jointly buy real property — do not share the bond of marriage, and thus the law allowed mechanisms for recovery if one party was forced to assume more than his fair share of the costs or if there was a breakdown in the relationship. Moreover, a tenancy by the entirety already contained a mechanism for the contingency that a marriage relationship may break down: separation or divorce expressly allowed the courts to divide equitably property owned by the tenants.
*77 However, the lack of a specific provision or doctrine of law providing a right of contribution in a tenancy by the entirety does not necessarily preclude a right of contribution. In the instant case, plaintiff advances the theory that Frank Mandeville is liable for contribution to the decedent’s estate on the basis of a theory of unjust enrichment.
Unjust enrichment is defined as the unjust retention of “ ‘money or benefits which in justice and equity belong to another.’ ”[24] The Restatement provides that “[e]ven where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it ”[25] This Court adopted a similar standard in Buell v Orion State Bank: “One is not unjustly enriched ... by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution.”[26] Thus, there can be no unjust enrichment where a party only receives or retains that which he already owns by operation of law.
II. application
With these principles regarding Michigan’s law of real property and equity in mind, I turn to the facts of *78 this particular case. Plaintiff asks this Court to order contribution from Frank Mandeville to his deceased wife’s estate under two alternative theories: either by a claim of unjust enrichment, or by extending Michigan property law to allow for a claim of contribution in a tenancy by the entirety. The majority has accepted this request, arguing that if there is no mechanism by which the estate can recover defendant’s proportionate share for money the decedent expended to maintain the tenancy’s properties, then defendant will be unjustly enriched by his wife’s maintenance of the properties before her death. Contrarily, defendant argues that contribution designed to prevent unjust enrichment does not apply where a cotenant by the entirety receives property by the right of survivorship. For the reasons set forth below, I agree with defendant.
A. NEITHER MICHIGAN LAW NOR PRINCIPLES OF EQUITY SUPPORT THE MAJORITY’S RULE
In light of the legal doctrines discussed above, defendant here is not unjustly enriched when he takes full ownership by a right of survivorship to property held as a tenant by the entirety. And this is true even if one cotenant has contributed more to the expenses of property ownership within the marriage, which is consistent with how the cotenants designed their marriage. There simply is no obligation in Michigan for a cotenant by the entirety to pay interest and expenses to the estate of the deceased cotenant when fee simple title passes by operation of law. The surviving cotenant, receiving title by right of survivorship as the parties agreed when titling the property, cannot be unjustly enriched. Instead, the cotenant by the entireties takes fee ownership to property in which he already had prior sole, inalienable ownership with his spouse. As this Court stated in Buell, there can be no unjust enrichment *79 where a person comes into ownership of property that “ ‘law and equity give him absolutely -without any obligation on his part to make restitution.’ ”[27] Here, by operation of law, Frank Mandeville automatically takes the properties in fee simple absolute by the right of survivorship inherent in the tenancy by the entirety, which was exactly the Mandevilles’ intent when they purchased the properties more than 20 years ago.[28] Neither plaintiff nor the majority can persuasively argue that, in taking full ownership to property he already owns, Frank Mandeville will retain “money or benefits” that belong to another.
The majority holds otherwise. Through an elaborate formulation, the majority attempts to rebalance the equities of the Mandevilles’ marriage in order to show that Frank Mandeville was unjustly enriched because his wife paid certain costs associated with home ownership for an 18-month period. In the process, the majority has created a rule that subverts the purpose of the tenancy by the entirety and unnecessarily allows the state to dissect the marital relationship for the purpose of reassigning equities contrary to how the parties saw fit to title their property and conduct their marital relationship. More disturbing, the majority does so notwithstanding the fact that neither Janet nor *80 Frank Mandeville took any legal action while both spouses remained alive that would have extinguished the tenancy by the entirety that governed the properties at issue here or rebalanced the equities of their marriage. Indeed, despite Frank Mandeville’s extended absence, the couple did not consider their marriage over,[29] they never sought a divorce or legal separation, nor did Janet Mandeville file an action for separate maintenance.[30]
*81 The majority’s opinion ignores the fact that marriage has always been recognized in Michigan as a special relationship unlike those involved in other concurrent ownership relationships. Thus, it is worthy of unique protections that can only be altered upon formal dissolution in a divorce or modification in a separate maintenance action. The majority’s decision transforms this special marital relationship into no more than a mere “business partnership.” Married couples have the additional options of buying property as tenants in common or joint tenants. A married couple that enters into a tenancy by the entirety does so in specific reliance on the unique protections that our common law affords this form of joint property ownership. Today’s decision eviscerates such reliance interests but fails to explain why these interests are no longer worthy of protection. The majority’s decision is yet another (however well intentioned) assault on the institution of marriage in our country.
The majority states that nothing in its analysis would alter the reality that Frank Mandeville is the fee simple owner of the properties previously held with his wife, and that the law of the tenancy by the entirety “has already been given full effect... ,”[31] This is true only to a certain extent.[32] The majority does not alter the actual ownership of the properly, but it does force defendant to compensate the estate for the privilege of such ownership — notwithstanding the fact that both the law and the express means by which the Mandevilles themselves titled their property provide this property to Frank Mandeville with no conditions whatsoever. Thus, *82 the majority cannot deny that it is today recognizing a new right of contribution that diminishes the property rights of a surviving tenant by the entirety.
Moreover, contrary to the majority’s argument, this is not an appropriate case in which to employ this Court’s equitable powers. Equity is customarily employed only where there is no adequate remedy at law.[33] Here, Janet Mandeville had several available remedies that she declined to pursue. These remedies include filing for divorce or separate maintenance.[34] An action for separate maintenance, for example, would not require the couple to seek a divorce; instead, a showing that the marriage relationship had broken down — precisely what plaintiff argues happened in this case — would allow the trial court to make a determination based on all the circumstances as to how much financial support would be due to a complainant.[35] It could do so on the basis of the evidence offered by both spouses — something that cannot be done after one of the spouses has died.
The fact is that a claim for separate maintenance seems to be precisely the remedy contemplated by our Legislature to provide relief to an aggrieved spouse in this type of situation. Yet, the majority cannot adequately explain why the already existing action for separate maintenance is an inadequate legal remedy. *83 Instead, the majority prefers to create an action for contribution that allows an estate to collaterally attack financial arrangements made during the course of a valid marriage. The majority states that an action for divorce or separate maintenance is “inappropriate” and “disproportionate,” and thus apparently “inadequate.” This is ironic given that the standard that the majority employs — a breakdown in the marital relationship sufficient to show that the couple is no longer acting as husband and wife — is precisely the standard used in an action for divorce or separate maintenance proceedings. I fail to see how the majority can reject this standard as inadequate as a matter of law while at the same time using it as an equitable substitute for these supposedly inadequate legal remedies. Although the majority argues that these remedies are not “as ‘effectual’ ” as a claim for contribution, that hardly demonstrates that they are inadequate as a matter of law.[36] Although the majority focuses on claims for divorce as “a hugely blunderbuss *84 ‘remedy,’ ”[37] it simply has no answer for why an action for separate maintenance is inadequate. This flaw in the majority’s argument not only belies its conclusion that equity should be employed in this case,[38] but also undermines the entire rationale of the majority opinion.
While it would certainly be troubling for courts to attempt to recalibrate the equities of a marriage after death, the majority’s decision is even more troubling because it does just that when the parties declined to take available legal action in life. A longstanding principle of this Court precludes equitable relief to parties who do not fully pursue the remedies available to them at law.[39] Just as Michigan courts are incompetent to grant a divorce after the death of one of the parties,[40] *85 unlike the majority, I believe that courts are equally incompetent to reassign equities, divide property, or award monetary contribution concerning marital property owned by the spouses after the death of one as if a divorce had occurred.
The majority also argues that the Legislature’s enactment of the surviving spouse provision of the Estates and Protected Individuals Code[41] indicates its intent to recognize that a marital relationship can cease to exist even if it is not officially or legally severed. This argument is simply a nonstarter. The surviving spouse provision states that, if certain conditions are met showing a breakdown in a marriage, then a surviving spouse will not be treated as having survived the decedent.[42] However, the provision also specifically restricts its applicability to issues of intestate succession, spousal elections and allowances, and priority among persons seeking appointment as personal representatives.[43] Thus, the Legislature expressly limited the surviving spouse provision to specific circumstances involving a deceased spouse, none of which is present here. Pursuant to well established principles of statutory construction,[44] this Court should decline plaintiffs *86 request to extend the application of this statute where the Legislature has expressly limited it.[45]
Today, however, the majority manufactures an extension of the surviving spouse provision despite the limitations plainly expressed by the Legislature. The majority borrows the criteria of the surviving spouse provision as a means of deeming the Mandevilles' relationship sufficiently defunct to merit the employment of equity through a right of contribution while it ignores the limitations that the Legislature specifically imposed. It stands to reason that any time a spouse qualifies under MCL 700.2801 as a nonsurviving *87 spouse, the majority would allow the estate of the decedent spouse to seek contribution for any perceived inequities. Thus, notwithstanding the majority’s protestations to the contrary, its theory now results in the wholesale application of the surviving spouse provision in a new class of cases not otherwise contemplated under the plain language of the statute. I do not believe it is within a judge’s power to borrow a limiting principle “inherent” in a statute that specifically excludes the very issue to which it would be applied and apply it in situations divorced from the statutory scheme and intent. The general equitable powers of this Court do not increase the judicial power to rewrite statutes.[46]
B. THE MAJORITY’S NEW RULE IS UNPRECEDENTED
The majority has not cited a single authority from this state or any other that provides support for its position allowing an action between spouses for contribution regarding property held as a tenancy by the entirety outside the context of divorce or separation proceedings. Indeed, no such authority exists. The decisions from other jurisdictions cited by the majority support its position only when read out of context and after ignoring those decisions’ own internal limitations. There should be no mistake: the rule that the majority today creates represents a radical departure from this state’s jurisprudence.
*88 In Crawford v Crawford, a wife sought contribution for property-related expenses incurred after the couple had separated but not yet divorced. At issue was the presumption that any money paid by one spouse should be considered a gift to the other spouse, and thus not eligible for contribution in the divorce. Under Maryland law, where the parties had separated before divorce, “a co-tenant in a tenancy by the entireties is entitled, to the same extent as a co-tenant in a tenancy in common or joint tenancy is entitled, to contribution for that spouse’s payment of the carrying charges which preserve the property.”[47] The Maryland Court of Appeals held that absent a showing that the paying party intended to make a gift, “a tenant by the entireties is entitled to contribution when he or she makes a payment, after the parties discontinue living together as husband and wife, which preserves the property and, therefore, accrues to the benefit of the co-tenant.”[48] In Maryland, where a court finds contribution appropriate for one cotenant in equitable separation proceedings, that cotenant may receive “Crawford credits.” As a later decision from the Maryland Court of Special Appeals explained:
A “Crawford Credit” is a credit that one co-tenant, who, after separation, lays out money to make mortgage payments or other carrying charges on property held as tenants by the entireties, is usually entitled to receive, absent an agreement between the parties. Prior to a divorce decree, the entitlement of a spouse to such credits is an equitable matter and not a matter of right.[49]
*89 The Maryland Court of Special Appeals later applied this concept in Turner v Turner, a divorce action that stated that the general law of contribution applies to a tenancy by the entirety “ ‘when married parties, owning property jointly, separate.’ ”[50] Crawford, as applied now when courts issue “Crawford credits,” appears to have become a legal colloquialism for assigning and balancing equities when dividing property in divorce proceedings. These decisions are entirely consistent with Maryland’s divorce law and provide no support for plaintiffs theory that contribution is appropriate where no divorce proceeding exists, and certainly not where a spouse has died.
Similarly, in Cagan v Cagan, a New York trial court allowed the plaintiff to recover costs for payments made by one tenant by the entirety in order to maintain the property and prevent foreclosure following an action for separation,[51] In a later case also from New York, the Supreme Court, Appellate Division, held that the responsibility for mortgage payments, taxes, and insurance on an entireties property should not be borne solely by the cotenant who remained in possession after a legal decree of separation was entered on the grounds of abandonment.[52]
The common thread among these cases is that the plaintiffs were able to overcome — in live divorce proceedings that sought to partition marital property — the presumption that money expended by one party to the divorce to maintain a concurrent estate was not a gift to *90 his or her spouse.[53] In a divorce action, it is necessary to make equitable divisions of property among the living spouses, and this necessarily includes what is often a couple’s largest asset: their home. It is an unremarkable proposition that divorce courts, sitting in equity while dividing marital property, would require contributions to the spouse who paid more than his share during the divorce process, even when dealing with a couple who own their home as tenants by the entirety.
And Michigan divorce law is in accord with these principles of law articulated in other states. Michigan law demands equity in divorce and other domestic relations proceedings. Statutory law provides that upon an annulment of a marriage, a divorce, or an order of separate maintenance, a court will divide property “as it shall deem just and reasonable. . . .”[54] A separate statutory provision allows a court to award to either party a portion of the other’s real and personal property, as well as spousal support, “as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.”[55] In sum, when apportioning marital property in a divorce, Michigan courts must make a division that, although it need not be equal, must be equitable considering all the circumstances.[56]
*91 However, the cases on which the majority relies— discussing the presumption of gift doctrine among spouses and equity in divorce and separation actions— interpret concepts that are separate and distinct from those relevant to a tenancy by the entirety that is automatically terminated upon death. As such, they are wholly inapposite to the case presently before this Court, and their “logic and reasoning” most certainly do not “closely resemble” this case, as the majority alleges.[57] They present facts and thus legal decisions involving a living husband, and wife in the context of divorce or separation actions that are being actually litigated for the very purpose of partitioning marital property. Indeed, the majority recognizes and admits this, stating that “the issues in these out-of-state cases undisputedly arise in the context of divorce and separate maintenance actions . .. .”[58] Yet, the majority’s *92 argument irresponsibly and imprecisely conflates the law of contribution as applied in these two separate and distinct contexts. The majority argues that, because domestic relations and divorce law generally allows claims of contribution when necessary to produce an equitable result, this should also control when determining parties’ rights and obligations in managing real property in probate after the death of a spouse. I strongly disagree.
It is difficult to apply the principles of these foreign cases after the death of one of the parties where there has been no divorce (or even any steps taken toward obtaining a divorce or separate maintenance), and no attempt to dispose of the property with judicial oversight while the parties remained alive. Contribution related to property held as a tenancy by the entirety is only available under Michigan law in the context of a divorce, separation, or separate maintenance proceeding where a court, addressing a breakdown in the marriage, is forced to balance the equities between the parties. Thus, because Janet Mandeville could not have sought contribution from defendant while alive because she did not pursue an action for divorce, separation, or separate maintenance, her estate likewise cannot pursue such an action.[59] The law is pellucidly clear that *93 absent the destruction of the tenancy by the entirety by one of the legal means previously described,[60] the death of a cotenant by the entirety automatically makes the surviving spouse the sole owner of the property and simultaneously extinguishes the decedent’s ownership interest in the property. Thus, by operation of the type of estate chosen by the Mandevilles and how the Mandevilles chose to structure and maintain their marriage, there is no entitlement to order contribution in this case.
C. ALTHOUGH THE COMMON LAW RULE IS EQUITABLE, THE MAJORITY REJECTS IT IN FAVOR OF A NEW RULE THAT IS CONTRARY TO THE POLICIES OF THIS STATE
While this Court unquestionably has the authority to modify the common law,[61] doing so is a task we approach with the utmost caution,[62] and this case is a good illustration as to why. We are presented here with a set of rules that has been in place and applied in common law societies since before Michigan became a state. Everyone from young couples buying their first home to estate planners advising their clients how to structure their property have relied on these tenets with the justified expectation that the force of law will protect their choices. The majority’s decision to change the common law in this case represents a sea-change in our laws governing property and threatens to upend legitimate financial relationships into which married persons have entered.[63]
*94 There is a great danger in authorizing courts to engage in post hoc factual inquiries concerning how a husband and wife should have decided to structure their marriage, their finances, and the various equities involved in a lifetime of making choices as a couple rather than as individuals pursuing separate self-interests. The majority fails to address the unknown— and perhaps unknowable — implications that accompany its change in the common law. Beyond recounting the facts of this case, the majority does not discuss what facts would be legally sufficient for courts to divide marital property equitably after death. Nor does the majority sufficiently address what would serve as the limiting principle concerning a contribution claim against the surviving spouse. Moreover, as previously stated, the majority’s new rule upsets the reliance interests of all Michigan spouses who have entered into tenancies by the entirety in preference'to other forms of lesser protected joint property relationships. Strangely, *95 but perhaps not unexpectedly, the majority opinion is silent on its justifications for unsettling these rebanee interests.
Instead, the majority rests on the standards set forth by the surviving spouse provision, inappropriately borrowing its framework to order contribution in this case, even though the Legislature never intended this provision to be used in such a way. Yet, where this Court is considering a sweeping change to Michigan’s common law through the employment of equity, I believe that the justices certainly owe more consideration and guidance to future courts than what amounts to the majority’s theory of “I know it when I see it.” The majority uses the rare facts of this case to change the overarching principle applicable in all cases; in essence, it uses the exception to rewrite the rule.
In its desire to order contribution for a plaintiff it clearly deems sympathetic, the majority leaves myriad questions unanswered regarding the scope of this new-found legal avenue to collaterally attack financial arrangements made in the course of a valid marriage. Particularly in situations where neither spouse ever asked a court to intervene in the marital relationship, it is deeply troubling that the majority now allows courts to do so under the guise of equity after the death of a spouse. This difficulty in allowing estates to pursue an action for contribution or unjust enrichment after the death of a spouse, particularly where neither party ever sought separate maintenance, is that doing so risks upsetting intimate and perfectly legitimate marital arrangements and the law that heretofore supported such relationships.
This difficulty arises because courts are poorly positioned to make such weighty decisions after the death of a married party, and especially as here, where the *96 parties themselves chose not to end their marriage. For example, at least in cases that follow the historical norm in which men contribute more than their spouses to acquiring and maintaining family property, the rule adopted by the majority may be turned into a “sword” to be used against stay-at-home wives and women who earn less than their husbands. Similarly, I wonder whether the majority would permit a rebalancing of marital equities any time a husband and wife have discontinued living together, or where there is no showing of an intent to make a gift, or where one spouse in a rocky marriage takes action that benefits the other spouse — all facts that the majority finds relevant to rebalance the equities of the Mandevilles’ marriage. Under the majority’s theory, what would stop disgruntled spouses, third parties, or courts from intervening in the financial arrangements of marriages wherever “principles of natural justice” and “good conscience so dictate”?[64] And to what extent does the majority allow courts to assess the equities of a marriage — which may last for decades — in determining the appropriate level for contribution? Should defendant receive credits or be allowed to counterclaim against a plaintiff-estate for areas in the marriage where he shared a larger portion of the financial burden, as he likely would have in a divorce or separate maintenance proceeding? The majority simply does not — and probably cannot — answer these questions. Because the method by which spouses arrange their financial circumstances is entirely a product of their own determination and in accordance with their wishes and values, I would decline to authorize this type of post *97 hoc judicial inquiry into the equitable nature of those arrangements that the majority permits — indeed, requires — upon a challenge of this nature.
Moreover, by accepting plaintiffs invitation to change our common law, the majority today creates an unprecedented action akin to allowing a new type of “posthumous divorce” in this state. As the preceding sections discussing Michigan divorce law and caselaw from our sister states demonstrates, the only method by which a spouse can normally obtain contribution for property involving a tenancy by the entirety is when a court is balancing equities concerning property in divorce or separate maintenance proceedings. That being the case, the majority grants plaintiff the same relief that Janet Mandeville would have been accorded in a divorce or separation, but without the benefit of an actual divorce or separation proceeding. And indeed, the majority treats the Mandevilles’ marriage as sufficiently defunct in order to hold defendant hable for contribution.
I strongly object to any decision that recognizes an action amounting to posthumous divorce.[65] Following this decision, Michigan courts are now permitted to determine after a spouse’s death whether a couple’s relationship had broken down in life in order to reassign equities just as a family court would do in divorce or separate maintenance proceedings. The facts of this case show that neither Frank nor Janet Mandeville legally ended their marriage or took the steps that *98 would allow courts to order contribution while Janet Mandeville was alive. Therefore, courts should not be allowed to rebalance the equities of a marriage after the death of a party as if there had been a divorce in order to determine the proper amount for monetary contribution. Recognizing the equivalent of posthumous divorce in this state is an untenable course of action for this Court to take where the positive law of this state has provided extensive indications that marriage is to be fostered, preserved, and ended only by judicial intervention at the request of the spouses themselves.[66]
I also recognize that the Legislature is better positioned to balance the complex public policy consider *99 ations inherent in plaintiffs request to allow the recalculation of equities after death or create a type of posthumous divorce in this state. As this Court has stated previously: “The responsibility for drawing lines in a society as complex as ours — of identifying priorities, weighing the relevant considerations and choosing between competing alternatives — is the Legislature’s, not the judiciary’s.”[67] This principle is even more important where the requested change in the common law is contrary to a public policy of the state, as is the case here.[68]
Further, I note that the Michigan Legislature has declined to adopt legislation that would have accomplished statutorily exactly the changes plaintiff seeks in the common law here.[69] And as observed earlier, the Legislature actually has acted in this area through its enactment of Michigan’s surviving spouse statute. However, the Legislature acted in a highly limited fashion and has not extended the statute’s reach in ways that would encompass the facts of this case.[70] In this regard, the Legislature has already selected a policy *100 for this state. Nevertheless, the majority apparently has no qualms extending the common law in a contrary fashion. As previously noted, long-established principles of statutory construction do not give this Court the authority to do so. Normally, if the Legislature believes that such a historical principle should be changed, it is free to do so. Although to date the Legislature has declined to make such a change, the majority has instead fashioned an unprecedented judge-created rule in contravention of this state’s public policy.
III. CONCLUSION
There is an old legal adage that “bad facts make bad law.” This phrase has rarely been as true as on the circumstances giving rise to this case. In its eagerness to provide relief to a plaintiff it deems sympathetic, the majority today rejects the legal remedies that were available to that plaintiff, and instead crafts an unprecedented new remedy. In doing so, the majority extends the law’s equitable reach in new and unique ways, unsettling centuries of law in this area and implicitly reworking what is the key feature of a tenancy by the entirety: the unencumbered right of survivorship. Moreover, by allowing courts to make post hoc determinations regarding the distribution of equities in a marriage, the majority’s decision imposes upon the citizenry of Michigan rules that amount to posthumous divorce under the guise of equity. And it does so by inappropriately borrowing the framework from a narrow statute limited in application by its explicit terms, resulting in the wholesale application of that statute into an area of law in which it was never intended.
Because the law’s equitable reach is surely not designed to allow the estates of parties to accomplish after *101 death that which the parties themselves declined to pursue in life, I dissent from the majority’s decision today. Instead, I believe that plaintiff cannot present a claim under Michigan law or in equity that would allow the decedent’s estate to recover contribution from defendant. Michigan law does not recognize a right of contribution among tenants by the entirety, and thus plaintiffs claim is not cognizable under our current law governing real property. Nor, perforce, is her claim justified in equity on a theory of unjust enrichment. Defendant was not unjustly enriched when, by operation of law, he took sole ownership of marital property previously held as a tenancy by the entirety with the decedent. Unlike the majority, I would decline to extend the common law of this state as plaintiff requests. Michigan’s public policy can provide no justification for, and is in fact antithetical to, the concept of “common law divorce” or the notion that courts should recalculate the equities involved in a marriage after a spouse has passed.
Accordingly, I vigorously dissent.

 This Court has on occasion allowed for the development of the common law as the circumstances and considerations of public policy have warranted, but our common-law jurisprudence has been guided by a number of prudential principles. See Robert E Young, Jr., A judicial traditionalist confronts the common law, 8 Texas Rev L & Pol 299, 305-310 (2004). Among them has been our attempt to “avoid capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences,” id. at 307, a principle that is quite applicable to the present case.

 See, generally, MCL 554.1 et seq.

 A tenancy in common, the default and most prevalent form of a concurrent estate, arises “ ‘[w]here two or more [persons] hold possession of lands or tenements at the same time, by several and distinct titles. The quantities of their estate may be different, their proportionate share of the premises may be unequal, the modes of acquiring these titles may be unlike, and the only unity between them be that of possession.’ ” Fenton v Miller, 94 Mich 204, 214; 53 NW 957 (1892) (citation omitted).
A joint tenancy, by contrast, is a single estate owned by two or more parties and is characterized by four “unities”: “ ‘joint tenants have one and the same interest; accru[e] by one and the same conveyance; commenc[e] at one and the same time; and have the same possession.’ ” Kemp v Sutton, 233 Mich 249, 258; 206 NW 366 (1925) (citation omitted). Michigan law has subsequently abolished the requirements of unities of time and title. See MCL 565.49. A joint tenancy may create a special right to survivorship in a tenant following a joint tenant’s death. See Albro v Allen, 434 Mich 271, 274-276; 454 NW2d 85 (1990); In re Renz’ Estate, 338 Mich 347, 356-357; 61 NW2d 148 (1953). Our law has long recognized that while joint tenancies are not favored, their creation with the accompanying right of survivorship is nonetheless permitted when expressly created. See Kemp, 233 Mich at 258; In re Blodgett’s Estate, 197 Mich 455, 461; 163 NW 907 (1917); see also 3 Comp Laws 1915, § 11562 (“All grants and devises of lands, made to two or more persons,... shall be construed to create estates in common, and not in joint tenancy, unless expressly declared to be in joint tenancy.”), which has endured as a legal presumption to the present day and is codified currently at MCL 554.44.
As will be discussed farther in greater detail later in this opinion, a tenancy by the entirety is a unique type of joint tenancy reserved for a married couple.

 Field v Steiner, 250 Mich 469, 477; 231 NW 109 (1930).

 Lord Blackstone has been credited with first authoritatively recording the existence of this concurrent estate. In his ubiquitous Commentaries, Blackstone noted:
And therefore, if an estate in fee be given to a man and his wife, they are neither properly joint-tenants, nor tenants in common: for husband and wife being considered as one person in law, they cannot take the estate by moieties, but both are seised of the entirety, per tout et non per my, the consequence of which is, that neither the husband nor the wife can dispose of any part without the assent of the other, but the whole must remain to the survivor.
2 Blackstone, Commentaries on the Laws of England 182 (R Bum ed, 1783) (1978) (emphasis added).

 See, e.g., Kemp, 233 Mich at 258 (noting that the four unities required to form a joint tenancy are that of interest, title, time, and possession), although the Legislature has since abolished the necessity of unity of time and title, see MCL 565.49.

 DeYoung v Mesler, 373 Mich 499, 502-504; 130 NW2d 38 (1964). The use of the words “tenancy by the entirety” or a derivative of the phrase need not be used to create the estate; similarly, a tenancy by the entirety will not be created just because the words are used if not otherwise appropriate. See, e.g., In re Kappler Estate, 418 Mich 237; 341 NW2d 113 (1983) (holding that a conveyance to two unmarried persons with the words “as tenants by the entireties” was ineffective to create a tenancy by the entirety, but instead created a tenancy in common).

 Long v Earle, 277 Mich 505, 517; 269 NW 577 (1936); Vinton v Beamer, 55 Mich 559, 561; 22 NW 40 (1885).

 Berman v State Land Office Bd, 308 Mich 143, 144; 13 NW2d 238 (1944); Hubert v Traeder, 139 Mich 69, 70; 102 NW 283 (1905). The one exception to this rule is statutory: MCL 557.101 allows either spouse to convey to the other spouse his interest in the property, which thereby terminates the tenancy by the entirety. See also Ash v Ash, 280 Mich 198, 199; 273 NW 446 (1937) (“Defendant could terminate the tenancy by the entirety by a conveyance of his interest in the land to his wife.”).

 Way v Root, 174 Mich 418, 427-428; 140 NW 577 (1913). Cf. Benjamin Franklin, Letter to Jean-Baptiste Le Boy, Nov 18,1789, reprinted in The Works of Benjamin Franklin (1817) (“[B]ut in this world, nothing can be said to be certain but death and taxes.”).

 MCL 700.2901(2)(g); see also Speier v Opfer, 73 Mich 35, 38-39; 40 NW 909 (1888).

 See, e.g., Rogers v Rogers, 136 Mich App 125, 134-135; 356 NW2d 288 (1984).

 Sanford v Bertrau, 204 Mich 244, 254; 169 NW 880 (1918); see also Estes v Titus, 481 Mich 573, 580-582; 751 NW2d 493 (2008).

 MCL 700.2807(1)(b).

 Lorimer v Julius Knack Coal Co, 246 Mich 214, 217; 224 NW 362 (1929).

 Caldwell v Fox, 394 Mich 401, 417; 231 NW2d 46 (1975).

 Id.

 See, e.g., Wettlaufer v Ames, 133 Mich 201; 94 NW 950 (1903); Reed v Reed, 122 Mich 77, 78-79; 80 NW 996 (1899).

 Strohm v Koepke, 352 Mich 659, 662; 90 NW2d 495 (1958). The law of other jurisdictions is generally in accord. For example, the Restatement of Restitution has long stated: “Where two persons are tenants in common or joint tenants and one of them has taken reasonably necessary action for the preservation of the subject matter or of their common interests, he is entitled to indemnity or contribution ....” Restatement Restitution, § 105(1), p 439 (1937) (emphasis added).

 Budwit v Herr, 339 Mich 265, 272; 63 NW2d 841 (1954).

 MCL 600.3304 (“All persons holding lands as joint tenants or as tenants in common may have those lands partitioned.”); see also 1 Restatement Property, 2d, § 4.5, comment b, p 229 (1983) (“A tenancy by the entirety creates an indestructible right in the surviving spouse to own in severalty the entire interest in the property. Compulsory partition is inconsistent with this characteristic of a tenancy by the entirety and, hence, compulsory partition is not available with respect to such a tenancy.”).

 Compare Pellow v Arctic Iron Co, 164 Mich 87; 128 NW 918 (1910), with Hubert, 139 Mich at 70.

 See In re Appeal of Lewis, 85 Mich 340; 48 NW 580 (1891).

 McCreary v Shields, 333 Mich 290, 294; 52 NW2d 853 (1952), quoting approvingly Hummel v Hummel, 133 Ohio St 520, 528; 14 NE2d 923 (1938) (emphasis added).

 Restatement Restitution, § 1, comment c, p 13 (1937). This Court has previously quoted approvingly this standard in Dumas v Auto Club Ins Ass’n, 437 Mich 521, 546; 473 NW26 652 (1991) (lead opinion by Riley, J.).

 Buell v Orion State Bank, 327 Mich 43, 56; 41 NW2d 472 (1950). This Court has similarly held that one cannot be unjustly enriched simply as a result of enforcing private agreements. See, e.g., Mich Med Serv v Sharpe, 339 Mich 574, 577; 64 NW2d 713 (1954) (“It is neither unjust, unfair nor inequitable to give effect to an agreement which was not induced by mistake, overreaching, fraud[,] or misrepresentation.”).

 Buell, 327 Mich at 56 (citation omitted; emphasis added). The majority criticizes my discussion here as “an oversimplification that is at odds with the realities of this case,” yet the majority can point to no place in the record nor any legal authority that establishes an agreement, understanding, or obligation for Frank Mandeville to make restitution in order to hold fee simple title to the property. This is unsurprising because the right of survivorship, by its very nature, unconditionally allows Frank Mandeville to do so without any obligations at law.

 Moreover, as defendant notes, he takes the property subject to a substantial mortgage that remains on the property. As a result, the deceased was provided the benefit of the use of the mortgage principal in her lifetime, yet upon her death the debt now resides with defendant alone.

 See Affidavit of Beverly Furnari, August 13, 2003. After being duly sworn, Ms. Furnari stated as follows:
1. That she was a close personal friend of Janet Mandeville and had frequent contact with her during the last few months of her life.
2. That through discussions with Janet Mandeville, she is aware that neither Janet Mandeville nor Frank Mandeville, Jr. considered their marriage to be terminated, deserted or abandoned by Frank Mandeville, Jr.’s extended absence exceeding more than one year prior to the death of Janet Mandeville.
This evidence is uncontroverted, yet the majority has decided simply to overlook this fact as inconvenient to its analysis.

 This is so even though the decedent attempted to divest her spouse of his interest in properties they owned by the entirety before she died — a fact to which the majority attaches a great deal of significance. See ante at 55-56. As was explained to Janet Mandeville by her counsel at the time she attempted to transfer her interest in the property by quitclaim deed, the documents drafted to accomplish this intention were entirely ineffectual to destroy defendant’s rights in the property that Janet Mandeville owned by the entirety with her husband. See supra at 72-73 (explaining that one spouse in a tenancy by the entirety can neither divest the other spouse of his interest or act unilaterally to alienate the entireties property). Janet Mandeville’s attorney testified at his deposition that “I explained to Jan that if, in fact, the real estate was owned by the entireties with her and Frank, that these quit claim deeds would have no validity whatsoever. That if Frank was alive, they would go to him.... She understood, she nodded. She said, ‘I understand.’ ” Plaintiffs attorney again conceded as much at arguments on this case: “She effectuated a deed which has obviously no legal significance because its impossible to — for her to transact that.”

 Ante at 51.

 The fact is, the estate did attempt to divest Frank Mandeville of his property interest in this property and only raised this contribution claim when that effort failed. The majority decision today allows this backdoor collateral attack on defendant’s property rights as the surviving tenant.

 Campau v Godfrey, 18 Mich 27 (1869).

 See MCL 552.6 (divorce) and MCL 552.7 (separate maintenance).

 See, e.g., Russell v Russell, 75 Mich 572, 572-573; 42 NW 983 (1889) (affirming an award of financial support from a husband to his wife where the husband had deserted the marriage). Since the adoption of no-fault divorce in Michigan, fault need not be shown in an action for separate maintenance; instead, an action showing that there has been a breakdown in the marriage relationship to the extent that the objects of matrimony have been destroyed and thus the marriage cannot be preserved is sufficient to support an award. See MCL 552.7(1).

 I further fail to see how the majority’s new remedy, which requires one spouse to sue another in court when demanding contribution, is any more “effectual” than an action for separate maintenance, even if it “preserves” the marital union — or whatever may he left of a union between spouses who communicate with each other through lawsuits.
The majority also worries that an action for separate maintenance opens the door for a court to enter a decree of divorce, and that this may be an unacceptable outcome for those couples who have moral or religious objections to divorce. This concern ignores what is obvious about such a concern: if a couple has religious objections to divorce, then by the nature of those objections, the responding spouse would not counterclaim for a divorce in an action for separate maintenance. In any case, where a couple has decided no longer to live together as husband and wife but not divorce, an action for contribution is no more effectual than an action for separate maintenance. The primary difference is that only the latter was provided for by our Legislature, and only the latter prevents a spouse from unilaterally requiring a court to rebalance the equities of marital decisions.

 Ante at 54-55.

 The majority quotes Powers v Fisher, 279 Mich 442, 447; 272 NW 737 (1937), for the proposition that the “legal remedy, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances....” How can separate maintenance possibly be viewed as inadequate when, if it had been pursued, it would have allowed Janet Mandeville to acquire the same costs her estate now seeks here, after making virtually an identical legal showing that the marital relationship had broken down?

 See Zoellner v Zoellner, 46 Mich 511, 515; 9 NW 831 (1881).
I do not, as the majority implies, believe that Janet Mandeville was “derelict” in pursuing her legal remedies. In many respects, she dutifully and permissibly transferred her legal interests to beneficiaries other than her husband. This is irrelevant, though, to whether she pursued an action for separate maintenance — she admittedly did not — which was the only permissible means for seeking payment from defendant concerning their marital property owned by the entirety. More important, this does not mean that her estate should be accorded the extraordinary relief sought here because she could not otherwise legally transfer her interest in real property.

 Michigan law provides that a court is without jurisdiction to render a judgment of divorce, and thereafter distribute property after the death of a party; in sum, one cannot judicially terminate a relationship that no longer exists because the death of a party. Tiedman v Tiedman, 400 Mich 571, 573; 255 NW2d 632 (1977); Zoellner, 46 Mich at 513-514.

 MCL 700.1101 et seq.

 MCL 700.2801(2)(e)(£).

 See MCL 700.2801(2), which provides that its application is only “[f]or purposes of parts 1 to 4 of this article,” which cover only issues of intestate succession, spousal elections and allowances, and priority among persons seeking appointment as personal representatives.

 See, e.g., Dep’t of Agriculture v Appletree Mktg, LLC, 485 Mich 1, 8; 779 NW2d 237 (2010) (“In interpreting statutory language, this Court’s primary goal is to give effect to the Legislature’s intent. If the Legislature has clearly expressed its intent in the language of a statute, that statute must be enforced as written, free of any ‘contrary judicial gloss.’ ”) (citation omitted); Miller v Mercy Mem Hosp, 466 Mich 196, 201; 644 NW2d 730 (2002) (stating that when interpreting a statute, “[w]e first *86 review the language of the statute itself. If it is clear, no further analysis is necessary or allowed to expand what the Legislature clearly intended to cover.”).

 This is the most basic of judicial interpretative rules, as members of the majority have properly recognized in the past. See, e.g., Robertson v DaimlerChrysler Corp, 465 Mich 732, 759 & n 14; 641 NW2d 567 (2002) (opinion by Markman, J.) (noting that “our judicial role ‘precludes imposing different policy choices than those selected by the Legislature.’ ” and stating: “The dissent ‘question[s] whether, under the majority’s approach, compensability for any mental disabilities would ever exist.’ To say the least, we respectfully disagree .... Compensability would exist where the Legislature has deemed there to be compensability, and it would not exist where the Legislature has not deemed there to be compensability. Whether such coverage is too broad or too narrow is not for us to decide.”); Henry v Dow Chem Co, 473 Mich 63, 102; 701 NW2d 684 (2005) (opinion by CORRIGAN, J.) (“Equity is indeed an instrument of justice. But when it is exercised without due regard for the interests of those who are not before the Court, its invocation can lead to great injustice. It is precisely because a decision in plaintiffs’ favor may have sweeping effects for Michigan’s citizens . . . that we believe this matter should be handled by those best able to balance these competing interests: the people’s representatives in the Legislature.”); Stokes v Millen Roofing Co, 466 Mich 660, 675, 677-678; 649 NW2d 371 (2002) (Markman, J., concurring) (noting the unfairness of the result, which is “highly inequitable,” but otherwise stating that this Court “cannot allow equity to contravene the clear statutory intent of the Legislature. . . . [I]f such inequitable results are to be avoided, it is the Legislature that must take action.”).

 See, e.g., Trentadue v Buckler Automatic Lawn Sprinkler Co, 479 Mich 378, 406-407; 738 NW2d 664 (2007) (“[I]f courts are free to cast aside a plain statute in the name of equity, even in such a tragic case as this, then immeasurable damage will be caused to the separation of powers mandated by our Constitution. Statutes lose their meaning if ‘an aggrieved party need only convince a willing judge to rewrite the statute under the name of equity.’ Significantly, such unrestrained use of equity also undermines consistency and predictability for plaintiffs and defendants alike.”) (citations omitted).

 Crawford v Crawford, 293 Md 307, 311; 443 A2d 599 (1982).

 Id. at 313. This same principle was applied in the same manner in Turner v Turner, 147 Md App 350, 406-407; 809 A2d 18 (2002), another Maryland case cited in this Court’s original remand order.

49 Freedenburg v Freedenburg, 123 Md App 729, 737 n 1; 720 A2d 948 (1998), citing Crawford and Broseus v Broseus, 82 Md App 183, 192; 570 A2d 874 (1990) (emphasis added).

 Turner, 147 Md App at 406, quoting Baran v Jaskulski, 114 Md App 322, 332; 689 A2d 1283 (1997).

 Cagan v Cagan, 56 Misc 2d 1045, 1049-1050; 291 NYS2d 211 (1968).

 Sterlace v Sterlace, 52 AD2d 743, 743-744; 382 NYS2d 191 (NY App 1976).

 States whose laws have this legal presumption apply it in relation to every type of concurrent estate. In addition to the above cases discussing the presumption in relation to a tenancy by the entirety, see also Kratzer v Kratzer, 130 Ill App 2d 762, 768-769; 266 NE2d 419 (1971) (tenancy in common); Heinemann v Heinemann, 314 So 2d 220, 221-222 (Fla App, 1975) (joint tenancy).

 MCL 552.19.

 MCL 552.23(1).

 E.g., McDougal v McDougal, 451 Mich 80, 88; 545 NW2d 357 (1996); Sparks v Sparks, 440 Mich 141, 149; 485 NW2d 893 (1992) (noting that *91 Michigan’s divorce “statutes each include an indication that general principles of equity must be considered”); Reeves v Reeves, 226 Mich App 490, 493; 575 NW2d 1 (1997) (stating that courts “must strive for an equitable division of increases in marital assets”).

 See ante at 62. Certainly those cases share some similar factual situations with this case — as any divorce or separation case likely will. This does not mean that the legal principles in those divorce and separation cases should be applied here, where one spouse is deceased. The majority extracts fragments of sentences from those opinions, showing how those phrases could be said to be true on the facts of this case by inserting the names of the parties in this case. In doing so, the majority does precisely what I believe is improper: it takes cases where courts in the context of divorce or separation proceedings are reassigning equities and uses them to reassign equities in this case.

 Ante at 60-61. The majority also argues that “[ri\o state whose courts have addressed this specific proposition has rejected it.” Ante at 61 n 15. This argument is disingenuous because no other state has considered the subject matter of this case. Indeed, in order to gain contribution among tenants by the entirety, every other state seems to require what this dissent requires: a live case and controversy among living spouses in a divorce, separation, or separate maintenance proceeding. The majority extracts a generalized rule from these other cases — -which allow contri *92 bution in these limited situations — in support of its unprecedented rule in this case allowing contribution generally and even after the death of a spouse.

 This makes the majority’s reliance on MCL 600.2921 inappropriate where that provision states that “[a]ll actions and claims survive death” and thereby allows estates to bring claims on behalf of their decedents. See ante at 60 n 14. Because there is no cause of action under Michigan law for a tenant by the entirety to seek contribution, MCL 600.2921 cannot save any claim for a decedent’s estate to pursue. To the extent that the Court of Appeals held contrarily, I believe that it erred; to the extent that the majority establishes a new right of contribution that may be "saved” by MCL 600.2921, it too errs.

 See page 74 of this opinion (discussing how a tenancy by the entirety can be terminated).

 See, e.g., Ames v Port Huron Log Driving & Booming Co, 11 Mich 139, 145-155 (1863) (opinion by Campbell, J., and opinion by Manning, J.).

 See, e.g., Henry, 473 Mich at 89.

 The majority chalks this discussion up to “unwarranted polity concerns,” ante at 58, but because plaintiff requests that we change the *94 common law of this state, it is imperative that this Court base its decisions firmly on the now-established laws and policies of this state. Indeed, the majority’s author has persuasively explained as much:
In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law. See Twin City Pipe Line Co v Harding Glass Co, 283 US 353, 357; 51 S Ct 476; 75 L Ed 1112 (1931). The public policy of Michigan is not merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law. There is no other proper means of ascertaining what constitutes our public policy. [Terrien v Zwit, 467 Mich 56, 66-67; 648 NW2d 602 (2002) (opinion by Markman, J.) (emphasis in original).]
My discussion below sets forth the arguments justifying my belief that the majority’s change to the common law is not based on the well established legal principles and policies of this state. That the majority’s decision is contrary to these policies speaks more to the lack of firm support for its opinion rather than any “flaws” in my discussion.

 Where, other than in the guts of the majority, shall we determine how “principles of natural justice” or “good conscience” should direct our decisions?

 Contrary to the majority’s attempt to disparage this argument as mere frivolity by stating, for example, that this Court is not taking anyone’s wedding rings, I simply state that the relief the majority orders in this case amounts to or is tantamount to a posthumous divorce. Where the majority makes such extraordinary factual findings as that the Mandevilles had “discontinued living together as husband and wife,” it is hard to argue that the majority is doing anything other than mentally divorcing the couple in order to hold defendant liable for contribution.

 By allowing post hoc, posthumous judicial inquiries into the equities of a marriage, the majority’s opinion here is in deep conflict with Michigan’s public policy favoring marriage. See Van v Zahorik, 460 Mich 320, 332; 597 NW2d 15 (1999); Wagoner v Wagoner, 128 Mich 635, 638; 87 NW 898 (1901).
The majority’s assertion that its opinion is the one that fosters and preserves marriage by allowing married couples to pursue actions for contribution is too clever by half. At its core, our society’s respect for marriage relies on the marital couple itself to chart its own course and make its own decisions. In return, the marital couple relies on a set of established principles — legal and otherwise — to ensure that decisions will be given effect. Unlike the majority, I am not prepared to alter either this reliance or the principles themselves where one party unilaterally decides that he or she no longer likes the marital agreement. Ultimately, the majority’s opinion allows plaintiff to obtain relief she otherwise would not be able to achieve based on the way the decedent and her husband structured their marriage. How can this possibly be said to preserve marriage or accord respect to the way a couple structured its marriage? Marriage necessitates mutuality in decision-making, yet the majority now grants to one spouse the power to invite courts into the marriage to analyze the decisions and equities as a court would in any normal business or partnership dispute — and worse still, it apparently allows a spouse to do so from beyond the grave. This absurd situation underscores the majority’s inability to recognize this case for what it is: a marriage that arguably faltered in its latter years because of apparent problems for which there are settled, appropriate, and adequate remedies in existence that neither spouse in this case pursued.

 O’Donnell v State Farm Mut Auto Ins Co, 404 Mich 524, 542; 273 NW2d 829 (1979); see also Henry, 473 Mich at 98 (“[W]hat we as individuals prefer is not necessarily what we as justices ought to impose upon the people. Our decision in this case is driven not by a preference for one policy or another, but by our recognition that we must not impose our will upon the people in matters, such as this one, that require a delicate balancing of competing societal interests. In our representative democracy, it is the legislative branch that ought to chart the state’s course through such murky waters.”).

 See Van, 460 Mich at 333 (“We hold that because the requested extension of the equitable parent doctrine would affect the state’s public policy in favor of marriage, the Legislature is clearly the appropriate entity to consider this issue.”).

 See SB 62 (2007). The bill, introduced by Senator Judson Gilbert, passed neither chamber of the Michigan Legislature.

 See pages 85-87 of this opinion.